234 P.2d 331

**STATE v. BEAL.**

No. 5337.

Supreme Court of New Mexico.

July 16, 1951.

Caswell F. Neal, Carlsbad, for appellant.

Joe L. Martinez, Atty. Gen., Walter R. Kegel, Asst. Atty. Gen., for appellee.

LUJAN, Chief Justice.

An information was filed against Charlie Beal in Eddy County charging him with the murder of Lynn Taylor, and upon the trial was found guilty of second degree murder. This appeal is from the judgment and sentence entered upon the verdict so returned.

The evidence for the state tended to show that the deceased, a fifteen-year-old high school student, together with three other companions of his age set out to celebrate Halloween night, October 31, 1949, and while in preparation for soaping the windows of the Mears Grocery Store, met a tragic death.

Cruz Fernandez, a deputy sheriff, called by the state, testified that he examined the premises where the deceased was killed and there found one empty hull approximately thirty feet and four inches east of the gasoline pump of the filling station. Approximately sixty-nine feet north of the

spot where the empty hull was found was a blood splotch. Fernandez further testified that and another deputy found three other shells; one was forty feet east of the gasoline pump, one approximately five feet away from the one just above described, and another one some forty-three feet east of the pump at a little angle. A fifth empty shell was picked up by some young boy in the vicinity of the third shell, but its exact location was not marked.

Don Ball testified that he, the deceased and two other boys set out to soap windows on the night in question. When they arrived at the grocery store and filling station Mr. Mears was closing it. Mr. Mears got in his truck and began backing it then he and Veryl Brunton hid behind a gasoline pump. Billy Yarbro was walking behind the truck. When Mr. Mears got out of his truck Billy hid behind a gasoline pump and when discovered Mr. Mears chased him around it, then he broke and ran away. He (Don) also ran away and when he had reached a point about eighty yards from the filling station, on the highway, he heard three or four shots.

Veryl Brunton, testified that on the way to Mears Grocery Store, he and the other boys soaped the windows of a truck which was parked in front of St. Francis Hospital. All of them then crossed the street on their way to the grocery store and filling station. When they got to the edge of the pavement of the highway they observed Mr. Mears closing the store. Mr. Mears then got on his truck and began to back it up. Mr. Mears passed close by him and Lynn Taylor who were hiding behind the air compressor. He did not say anything to them but was mumbling to himself. When Mr. Mears got to the edge of the station both ran up the highway. When he and Lynn Taylor reached a point about ninety yards from the store and filling station he heard the first shot, but he kept on running and met Don Ball who was also running away. Within a few seconds after the first shot he heard four or five more fired in rapid succession. The first shot sounded no louder than the rest of them.

Dr. G. C. Hogsett, testified that he examined the body of Lynn Taylor and found a gun shot wound on the back of the head, the bullet entered the rear of the skull just behind the right ear and passed directly through the brain and lodged in the skin just over the left eye.

B. E. Allison, testified that he lived about one hundred feet on the opposite side of the street from Mears' Grocery Store and Filling Station. On October 31, 1949, at about 7:15 or 7:20 o'clock in the evening while he was outside the house he heard a shot, then there was a pause of about fifteen or twenty seconds, then he heard three or four more shots fired in rapid succession. The first shot sounded no louder than the rest. The flash from the

first shot came from the south side of the filling station at the edge of the pavement. The other flashes came from a gun fired from the middle of the highway. The flashes came from a gun pointed in a horizontal direction. He had been in the Mears' grocery store on that evening at about 7:00 o'clock. While there he had a conversation with the defendant about it being Halloween night. Several children came into the store all blacked up. He made the remark "I believe I will go home —these spooks are already out after me and I think I will get on home," just hurrahing them. He purchased some penny candy and chewing gum and things to treat the kids because he knew they would come to his house. The defendant's wife made the remark to Mr. Mears, her father, that "those kids are going to be here and you just as well treat them with some penny candy and get rid of them—that is the easiest way to get shut of them."

The defense was based upon the claim that the defendant believed his father-in-law was being robbed and that he went to his aid. He testified that when he stepped out of the trailer house door, which was located about thirty-five or forty feet behind the grocery store some one ran in front of him breathing hard and running fast. At the same time he heard a clacking noise. He looked in the direction of the grocery store and saw some one run across the highway. He turned back went into the trailer house and got his .22 automatic pistol and ran as far as Mr. Mears' truck which was parked on the side of the building and called for Mr. Mears but received no answer. He heard some one say what he thought was "help." He heard a shot and two boys ran around the side of the building. He then started firing into the air. He thought Mr. Mears was being robbed otherwise he would not have fired the shots. Mr. Mears came around the corner of the building and said "Charlie, I shot in the air." The boys were not bothering anyone; they were running away. He fired five or six shots. He never denied shooting Lynn Taylor.

Mr. Glenn Mears, called by the defense, testified substantially as follows: That he operated a grocery store and filling station at Loving, New Mexico. On October 31, 1949, while backing his truck after closing the store he noticed some one behind him. He stopped and got out of the truck but by that time the person had disappeared. He saw the shadow of a man next to the gasoline pump and started to investigate but when he got to the pump the person ran around it and he chased him until he broke and ran away. Then he started towards the store and when he got close to the air compressor he saw two or three persons break and run. He yelled at them to "halt or stop," he does not remember which. At that moment he heard some shots. He had a gun in his hand but

did not fire it. On cross-examination, he stated:

"Q. Did you take the gun out of the scabbard when you—? A. Not that I know of.

\* \* \* \* \* \*

"Q. Then as far as you remember, you never had taken the gun out of the scabbard? A. I don't know, I don't think so, I don't know.

\* \* \* \* \* \*

"Q. And when you saw these boys around the filling station and saw them run, you didn't shoot? A. No.

"Q. Why didn't you shoot? A. Because they were running out from me. They weren't threatening me any bodily harm.

"Q. Could you have shot them if you wanted to? A. I might have. I don't know. I might have missed them but I could have shot if I had wanted to.

"Q. But you didn't see any necessity for shooting, did you? A. No, I didn't.

\* \* \* \* \* \*

"Q. Do you remember the last time you shot the gun? A. The last time that I had knowledge of shooting the gun was something over a year before."

▮ The defendant excepted to instruction No. 20-A. He contends that it was erroneous in that it required the existence of an absolute necessity for the killing; and that it wholly denied to the defendant a submission of the question of apparent necessity. In instruction No. 20, the court laid down general principles, and instruction No. 20–A is obviously a continuation of the matters treated in instruction No. 20, and fully ties into the discussion of the right to kill to prevent the commission of a felony. These instructions read as follows:

"No. 20. You are instructed that if you find from the evidence or have a reasonable doubt therefrom that at the time and place of the firing of the shots by the defendant at the deceased and his companions, the defendant as a reasonable man believed that the deceased and his companions were engaged or were about to engage in the commission of a felony and the defendant as a reasonable and prudent man believed that it was necessary or apparently necessary to fire the shots so fired by him in order to prevent or stop such felony, then you will find the defendant not guilty.

"On the other hand, if you find and believe from the evidence beyond a reasonable doubt that under the circumstances at the time and place of the shooting, the defendant did not as a reasonable and prudent man under the same or similar circumstances reasonably believe that a felony was about to be committed or was

being committed or that the defendant did not as a reasonable and prudent man under the same or similar circumstances would have reasonably believed that there was a necessity or an apparent necessity for the firing of the shots or the killing of the deceased in order to prevent the commission or accomplishment of a felony then the killing was not excusable or justifiable.

"No. 20–A. If you find from the evidence beyond a reasonable doubt that at the time the defendant shot and killed the deceased, the defendant did not entertain a reasonable belief that the said felony was being committed or there was imminent danger of it being committed by the deceased, or if he did entertain said belief that he did not then entertain an honest belief that the killing was necessary in order to prevent the accomplishment of a felony and that he was not justified under the other instructions in shooting the deceased and you further find from the evidence beyond a reasonable doubt that at said time the defendant shot the deceased intending to punish him for a felony already committed rather than for the purpose of preventing the commission of a felony or in the protection of himself or his family the defendant would then be guilty of murder in one of the degrees as defined in the other Instructions heretofore given."

. The instruction does not require the jury to find as a condition of acquittal, as de-fendant insists, that the killing was absolutely necessary in order to prevent the commission of a felony. According to its very terms, all the jury need find is that the defendant entertained an honest and reasonable belief that it was necessary. The question submitted to the jury was whether the defendant believed it necessary and whether under all the facts and circumstances of the case a reasonable person, in the position of the defendant, would have considered it necessary.

The general rule is stated in 40 Corpus Juris Secundum, Homicide, § 101, page 961, as follows: " * * * To justify the killing, it must be done in good faith and under an honest and reasonable belief that a felony is about to be committed and that the killing is necessary in order to prevent its accomplishment. There need not be an actual necessity for the taking of life to prevent the felony, provided the circumstances are such as to impress the mind of the slayer with a reasonable belief in such necessity. However, their either must be a necessity, or the circumstances must be such as to excite the fear of a reasonable man of a necessity, to take life to prevent the commission of a felony. *A bare fear of the commission of a felony is not sufficient to constitute a justification.* To be justifiable, the killing must be done while the person killed is in the act of committing the offense, or after some act done by him showing an evident intent to

commit such offense. It generally must be done for the prevention of a felony and not as a punishment for a felony already committed, * * *." (Emphasis ours.)

 It was upon this rule of law that the jury was instructed, and correctly so. The doctrine of apparent necessity arises not from the belief of the defendant. It is only when the belief that his action was absolutely necessary is tested by the reasonableness of that belief that the doctrine of apparent necessity comes into consideration. In State v. Chesher, 22 N.M. 319, 161 P. 1108, the court held: "The standard by which the jury must determine the reasonableness of belief of accused that danger is so apparently imminent that he must act in self-defense is that of an ordinary person of firmness, reason, and prudence, not that such question should be determined from the standpoint of the accused". See, also, State v. Dickens, 23 N.M. 26, 165 P. 850.

It is next urged that the court erred in giving instruction No. 22, which reads as follows: "On the defense interposed by the defendant that he believed the deceased and his companions were engaged in the commission of a felony, the jury will remember when considering the court's instructions on justifiable homicide that to justify the killing on such ground it must be done in good faith and under the honest and reasonable belief that a felony is being committed or is about to be committed, and that the killing is necessary or apparently necessary in order to prevent its accomplishment. There must either be a necessity or circumstances must be such that as viewed by a reasonable man under the same circumstances as the defendant at the time and place of the shooting that an apparent necessity existed to take life to prevent the commission of a felony. The killing must be done for the prevention of a felony and not as a punishment for a felony already committed. After the necessity has ceased and the supposed felon flees and thereby abandons his proposed designs, a killing in pursuit is not justified however well founded the belief may be that he had intended to commit a felony unless the deceased had in fact committed the felony. So, in this case; (1) If you find from the evidence beyond a reasonable doubt that the acts of the deceased and his companions at and prior to the time of the killing were not such as, under the circumstances then existing, to induce a reasonable belief in the mind of the defendant that they were about to commit such felony; or (2) if you find from the evidence beyond a reasonable doubt that the defendant at the time he shot and killed the deceased did not in good faith entertain an honest belief that the deceased or his companions were then and there either engaged in the commission of said felony or that there was imminent danger of their

so doing; or (3) if you find from the evidence beyond a reasonable doubt that the defendant at the time he shot and killed the deceased, did not in good faith believe that there was a necessity or apparent necessity for killing the deceased in order to prevent the commission of said felony, or that the defendant did not act under such belief at the time he shot and killed the deceased; then, and in either of said events, the killing was not justified, and you cannot acquit the defendant on such grounds."

The effect of this instruction is to tell the jury they should convict the defendant, if they believe and find that the necessity which otherwise would excuse the killing had ceased; that is to say, that the supposed felons were fleeing and in so doing were abandoning their supposed designs. In Corpus Juris Secundum, supra, we find the following language: "The mere intent of a person to commit a felony, without any overt act indicative of such intention, will not justify the killing of such person by way of prevention; and after the necessity has ceased, and the supposed felon flees and thereby abandons his supposed design, a killing in pursuit is not justified however well founded the belief may be that he had intended to commit a felony."

A well founded belief that a known felony was about to be committed will extenuate a homicide committed in prevention of the supposed crime, and this upon a principle of necessity; but when the necessity ceases, and the supposed felon flees, and thereby abandons his proposed design, a killing in pursuit, however well grounded the belief may be that he intended to commit a felony will not extenuate the offense of the pursuer. This extenuation rests upon an actual felony committed, and a necessity for the killing to prevent the escape of the felon. The evidence shows that no felony had been committed. The defendant saw one of the boys running away at the time he stepped out of the trailer door. He ran from his trailer house to the pick-up truck of his father-in-law, saw two more boys run around the side of the grocery store and on up the highway. He then went to the edge of the pavement and began shooting. The last shot in the magazine of his automatic pistol was the fatal one which killed the deceased who was running away and had travelled approximately seventy feet from the premises on the public highway when he was felled.

It is finally urged that the court erred in refusing to give defendant's requested instructions Nos. 1, 2, 3 and 5. Suffice it to say that we have carefully examined these instructions and find that they are not applicable as they were prepared to fit the facts in the case of State

v. Couch, 52 N.M. 127, 193 P.2d 405, which are not analogous to the facts in this case. It is a universal rule that instructions should be confined to issues upon which testimony was given during the trial. The requested instructions dealt with matters extraneous to any issue in the case, and there was therefore no error in refusing them. State v. Evans, 48 N.M. 58, 145 P.2d 872; State v. Jackson, 30 N.M. 309, 233 P. 49; State v. Moss, 24 N.M. 59, 172 P. 199; State v. Goodrich, 24 N.M. 660, 176 P. 813; State v. Orfanakis, 22 N.M. 107, 159 P. 674.

There is no evidence in the record that the deceased and his companions, at or prior to the killing of the deceased had in any manner threatened or molested the premises of defendant's father-in-law. Instructions should not only state the law correctly, but they should be applicable to the case and give the jury to understand what the law is that is applicable thereto, and the refusal to give an instruction not applicable and which has a tendency to mislead the jury is not error.

A careful examination of the entire record fails to show any error of law. The rights of the defendant in all respects were fully protected. The judgment is affirmed, and it is so ordered.

SADLER, McGHEE, COMPTON and COORS, JJ., concur.