385 P.2d 967

**STATE of New Mexico, Plaintiff-Appellee,**

**v.**

**Lloyd ROMERO, Defendant-Appellant.**

**No. 7234.**

Supreme Court of New Mexico.

Sept. 16, 1963.

110

Albert J. Rivera, Alamogordo, for appellant.

Earl E. Hartley, Atty. Gen., Norman S. Thayer, Joel M. Carson, Asst. Attys. Gen., for appellee.

CHAVEZ, Justice.

Appellant, Lloyd Romero, was convicted of the crime of assault with intent to kill Johnny Silva, as alleged in count I of the information, and was also found guilty of

count III of assault with a deadly weapon upon Johnny Herrera. From the judgment and sentence of the district court, Lloyd Romero appeals.

The judgment and sentence of the court on count I was that appellant be confined in the state penitentiary for a term of not less than seven years nor more than fifteen years, and on count III, to serve a term of not less than two years nor more than three years, the sentences to run concurrently.

Appellant, Lloyd Romero, age twenty-one, and his twin brother, Floyd Romero, on December 9, 1961, went to the home of Johnny Herrera in Roswell, New Mexico, where a farewell party was being given for Robert Garcia. The party was attended by several people, among whom were Robert Garcia and his wife, Maggie Garcia, Johnny Silva and his brother, Raymond Silva, both musicians at the party, Dillie Romero, wife of Floyd Romero, Connie Carrillo, Margie Campos, Johnny Herrera and Jimmie Garcia. Some of the participants at the party were drinking alcoholic liquor, mostly beer.

Appellant and his brother came to the party uninvited, for the first time late in the night. While there, an argument ensued between appellant and Robert Garcia about appellant slapping Garcia's wife, Maggie Garcia. Mrs. Garcia said that appellant had hit her and appellant denied it. Another argument ensued inside the house between Floyd Romero and his wife, Dillie, wherein Floyd Romero was "shoving her and shaking her." Still another argument appears to have taken place outside the house between Lloyd Romero and Robert Garcia, about Lloyd mistreating Robert Garcia's wife. After this argument, the twin brothers left, but returned later in the evening.

Sometime during the party, Johnny Herrera was kissing Margie Campos. She started screaming and went outside. Herrera testified that he ran her off. Margie Campos got into appellant's automobile and sat next to him. George Antunez, who had then just driven up, went over to appellant's car and started pulling Margie Campos out of the car. Johnny Herrera told George Antunez that he did not want any trouble and asked him to go home, whereupon Antunez "slung" out a knife and cut Johnny Herrera between the fingers of his left hand. When Antunez cut Johnny Herrera, Herrera jumped Antunez and "was struggling with him and I heard a shot and the next shot I felt hit my knee." Appellant pointed the gun at Johnny Herrera again and Herrera started backing away. At this time Johnny Silva came up and said to appellant: "You shot down Johnny, what did you shoot him for?" Appellant then turned around and shot Johnny Silva in the neck. Johnny Herrera testified that he did

not have a knife or a weapon of any kind at that time.

Raymond Silva testified that he heard the third shot and saw Johnny Silva going down; that at the time Johnny Silva was falling, appellant had a gun in his hand; and that he did not see any weapon in Johnny Herrera's hand. He further testified that he asked appellant, "Why did you shoot him?" Whereupon, appellant turned around and said to him, "You're next," and appellant clicked the gun, but the gun did not go off. After the shooting, Raymond dragged Johnny Silva to his car.

Antunez testified that Johnny Herrera had a knife, although when cross-examined, he admitted that in the statement he gave to the officers on December 11, 1961, he stated that he did not see a knife in Johnny Herrera's hand that night.

Johnny Silva testified that he and his brother Raymond, who had played guitar music at the party, were leaving because of the arguments; that they went outside of the house, started to place the guitars in the trunk of their car, and then saw and heard an argument among a group of people; that he "saw two shots go off and Johnny Herrera running backward, grabbing his knee;" that appellant had a gun and Johnny Silva hollered at appellant, saying, "Quaty [Cuate], Twin," and asked him why he shot John; that appellant, when about five feet from Johnny Silva, pointed

his gun, fired and hit him in the neck at the middle of the throat; that he did not have a knife or any weapon in his hand before he was shot that night.

Margie Campos testified that, after Johnny Herrera had pushed her into a bath tub, he went outside and she also went outside and was going to walk home when she saw appellant in his car; that she got into the car with appellant who was to take her home; that George Antunez came over to the car and pulled her out of the car by her hair; that, while she and Antunez were arguing, Johnny Herrera came from the back with a knife, got Antunez by the shoulder and turned him around, and that was when Antunez took his knife out and they swung at each other. On cross-examination, she testified that she gave a statement about 10:50 a. m. on December 9, 1961, and did not say anything about her having seen Johnny Herrera come up behind Antunez with a knife. She also testified that she saw one of the Silva boys get shot in the throat.

Frank Espinoza testified that, while in his home on December 9, 1961, about 1:00 or 2:00 a. m., two rocks broke the windows of his house; that he went out to the porch and yard and heard two shots; that he saw six or eight people fighting, throwing rocks and beer bottles at a blue car; that he found three beer bottles in his yard and others were in the street; that he is sure the rocks were thrown before the shots were fired;

and he identified Raymond Silva as one of those who was throwing rocks.

Dr. J. Paul Reynolds, osteopathic physician and surgeon, testified as follows regarding his examination of Floyd Romero on or about December 10, 1961:

"A. * * * he had a discoloration and slight swelling over the right eye."

As to Lloyd Romero's condition, the doctor testified:

"A. * * * he was answering questions sort of slowly, but he had several marks on his fact [sic], but the main trouble was a swelling and discoloration of the left side of the forehead, extending back to the hair line in the temporal area.

\* \* \* \* \* \*

"Q. And, what was that diagnosis?

"A. Abrasion and contusions of the left frontal and temporal area with possible concussion syndrome."

With regard to appellant's history given to the doctor by appellant, the doctor testified:

"A. Well, I asked him what had happened and he was rather vague. He didn't know exactly what happened, and—but, in examining him I found that the pupils were slightly dilated and re-acted slow-ly to light. He acted sort of dazed and complained of a headache, and with the type of swelling and apparent blow that had been struck to the head, I assumed he was in a condition caused by a— well, a blow that would cause damage to the frontal area of the brain which would make him rather confused and sluggish to answer questions. And, also, this headache which had persisted was the thing that is one of the most common findings following a concussion. You may talk and all that, but you still have the headache and you're apparently a little—not quite as alert as you might be normally in answering questions."

Appellant's point I claims error in the trial court's refusal to grant appellant's requested instructions Nos. 1, 3, 4, 5, 7 and 8, on the doctrine of self-defense. Appellant argues that, although he did not take the stand in his own defense, a strong inference of self-defense was presented. There is no merit in appellant's point I. A review of the evidence clearly shows that an instruction on self-defense was not warranted.

There is no evidence in the record which would raise a reasonable doubt as to whether the crimes with which appellant was charg-

ed were committed in self-defense. The evidence being insufficient to raise such doubt, the tendered instructions on that issue were properly refused. State v. Heisler, 58 N.M. 446, 272 P.2d 660.

 There is no evidence in the record that appellant actually believed himself in danger and acted upon such belief. State v. Parks, 25 N.M. 395, 183 P. 433. Instructions should be confined to issues upon which testimony was given during the trial. State v. Beal, 55 N.M. 382, 234 P.2d 331.

██ In order to justify an instruction on self-defense, there must be evidence of an actual attempt or offer to do bodily harm, or the accused must have had reasonable ground to apprehend a design on the prosecutor's part to commit a felony on him, or to do some great bodily harm, and that there was imminent danger to him of such design being accomplished. 6 C.J.S. Assault and Battery § 92, pp. 944–945.

██ Appellant's point II raises the serious question on this appeal. Appellant contends that the judgment and sentence of the trial court was not in accordance with § 41–17–1, N.M.S.A., 1961 Pocket Supp., (Laws 1955, Ch. 150, § 1), which provides:

"* * * The court in imposing such sentence shall *sentence the person for the term as prescribed by law for the particular crime of which he was con-*victed. The term of imprisonment of any person so convicted shall not exceed the maximum nor be less than the minimum term fixed *by law.* * * *" (Emphasis added).

The above cited statute amended the old § 41–17–1 N.M.S.A., 1953 Comp., (being Laws 1909, Ch. 32, § 1), the pertinent part of which provided:

"* * * The court in imposing such sentence shall *fix the maximum and minimum duration of the same.* The term of imprisonment of any person so convicted shall not exceed the maximum nor be less than the minimum term fixed *by the court.* * * *" (Emphasis added).

The term prescribed by § 40–6–6, N.M.S.A., 1953 Comp., for the crime of assault with intent to kill is that:

"* * * he shall be punished by imprisonment in the state penitentiary for not more than twenty-five (25) years, nor less than one (1) year, or by fine not exceeding one thousand dollars ($1,000.00), or by both such fine and imprisonment in the discretion of the court."

The penalty provided for assault with a deadly weapon is a fine not exceeding $1,000, or by imprisonment not exceeding three years. Section 40–17–4, N.M.S.A., 1953 Comp.

Appellant was sentenced to serve "not less than seven years nor more than fifteen years."

It seems clear to us that Ch. 150, § 1, N.M.S.L., 1955 (§ 41–17–1, supra), the so-called indeterminate sentence law, was intended to require a trial judge to sentence a person found guilty of a given offense to the minimum and maximum provided by statute for said offense. It was intended to take away the discretion previously existing in the trial court, to sentence to any term within the minimum and maximum fixed in the particular penal statute. The sentence as given in this case would have been within the discretion given to the trial court under the former statute. To now say that the amendment placed no limitation on this discretion would appear to ignore what was an apparent legislative intention in making the amendments, particularly those italicized hereinabove. To us, it is quite obvious that the 1955 amendment completely removed from the trial court any discretion in pronouncing sentences other than for the minimum and maximum provided by law for the particular offense involved. Any other construction would render the change unnecessary and meaningless.

We are further convinced of the intent of the legislature by the enactment of Ch. 303, § 29–3, N.M.S.L., 1963 (§ 40A–29–3, N.M.S.A., 1963 Pocket Supp.), the Criminal Code which, in each pertinent subsection, provides that where a defendant has been convicted " * * * the judge shall sentence such person * * * for the term of not less than * * * years nor more than * * * years * * *." Clearly, under this provision the trial judge must impose the minimum and maximum term. The above provision is a legislative reiteration of what was intended in Ch. 150, N.M.S.L., 1955, supra.

We should here note that in State v. Armstrong, 61 N.M. 258, 298 P.2d 941, the court, by way of dicta, said that the Indeterminate Sentence Act "removed the discretionary powers of the trial judges to fix minimum or maximum sentences," and, although in the Armstrong case a sentence of not less than eight years nor more than ten years was approved, we call attention to the fact that the offense was committed before Ch. 150, N.M.S.L., 1955, supra, became effective and was controlled by the law as it existed when the offense was committed. See also, State Board of Parole v. Lane, 63 N.M. 105, 314 P.2d 602.

Appellee directs our attention to the provisions of § 41–13–2, N.M.S.A., 1953 Comp:

"In the trial of the criminal cases, punishment within the limits prescribed by law shall be assessed by the court in its discretion; but juries may, in their discretion, upon return of a verdict of guilty in any criminal case, recommend defendant to the clemency of the court,

and any such recommendation shall receive due consideration by the court."

The attorney general argues that the above statute is still effective unless repealed by implication, and that repeals by implication are not favored. State v. Valdez, 59 N.M. 112, 279 P.2d 868.

It appears to us that the clemency statute, § 41–13–2, supra, can be given effect under the provision for suspending judgment contained in Ch. 150, § 1, N.M.S.L., 1955, supra. If judgment were suspended, pursuant to a recommendation of clemency under § 41–13–2, supra, both statutes would be given effect in accord with the universally accepted rule to this effect. Bartlett v. United States, (10 CCA 1948), 166 F.2d 920.

We might also add that it is significant that the parole law was enacted at the 1955 session of the legislature (Ch. 232, N.M. S.L., 1955; §§ 41–17–12 to 41–17–34, N.M. S.A., 1961 Pocket Supp.), as was the indeterminate sentence law (Ch. 150, N.M.S.L., 1955), and the two acts were intended to work together to accomplish an enlightened handling of persons convicted of crimes. We recognized this in McCutcheon v. Cox, 71 N.M. 274, 377 P.2d 683.

For the reasons given, the cause is reversed and remanded to the district court with direction to impose sentences not inconsistent with the views herein expressed.

It is so ordered.

CARMODY and MOISE, JJ., concur.