IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMSC-050

Filing Date:  September 28, 2009

Docket No. 30,657

STATE OF NEW MEXICO,

        Plaintiff-Respondent,

v.

NICK R., a child,

        Defendant-Petitioner.

ORIGINAL PROCEEDING ON CERTIORARI
Sam B. Sanchez, District Judge

Hugh W. Dangler, Chief Public Defender
Nancy M. Hewitt, Appellate Defender
J.K. Theodosia Johnson, Assistant Public Defender
Santa Fe, NM

for Petitioner

Gary King, Attorney General
Andrew S. Montgomery, Assistant Attorney General
Santa Fe, NM

for Respondent

## OPINION

**DANIELS, Justice.**

{1}     Petitioner Nick R., a sixteen-year-old student at Taos High School, was charged in Children's Court with possessing a deadly weapon on school premises, in violation of NMSA 1978, Section 30-7-2.1 (1994).  The issue before us is whether the Legislature intended to make an ordinary pocketknife a per se deadly weapon in the Criminal Code's statutory definitions, without regard to either its actual use or a person's purpose for carrying it, and thereby preclude any right to a jury determination of its status as a deadly weapon in

1

the circumstances of a particular case.

**{2}** Although Section 30-7-2.1 does not refer to a pocketknife or define the term "deadly weapon" in any other way, NMSA 1978, Section 30-1-12(B) (1963) provides that, "[a]s used in the Criminal Code":

> "deadly weapon" means any firearm, whether loaded or unloaded; or any weapon which is capable of producing death or great bodily harm, including but not restricted to any types of daggers, brass knuckles, switchblade knives, bowie knives, poniards, butcher knives, dirk knives and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including swordcanes, and any kind of sharp pointed canes, also slingshots, slung shots, bludgeons; or any other weapons with which dangerous wounds can be inflicted[.]

**{3}** The Court of Appeals affirmed rulings of the Children's Court that Petitioner was not entitled to have a jury decide whether he had the intent to possess a pocketknife as a weapon. *State v. Nick R.*, No. 27,145, slip op. at 2 (N.M. Ct. App. Aug. 30, 2007). Our review of the definitional statute's language, its history, its purposes, its relationship with other statutes, and over one hundred years of New Mexico case law leads us to the opposite conclusion. We therefore reverse the contrary rulings of the lower courts.

## I.    FACTS AND PROCEEDINGS BELOW

**{4}** The relevant facts were stipulated by the parties. Petitioner Nick R. worked after school hours for his father at a furniture store. His father supplied all store employees, including Nick, with pocketknives for opening boxes at work. One day in his math class, Nick felt something in his pocket and pulled it out to look at it. It was the pocketknife he had been using at work the evening before when he had been wearing the same pair of pants. His math teacher spotted him "messing around" with the unopened pocketknife underneath his school desk, confiscated it, and turned it over to school authorities. Nothing in the record indicates that the pocketknife was ever used or intended to be used as a weapon.

**{5}** Nick was suspended from school pending an administrative investigation, but he was reinstated after the superintendent of schools determined that he had not intentionally brought the pocketknife onto campus. Three months later, the State filed a delinquency petition in Children's Court, charging that Nick had committed a delinquent act under the Children's Code, on the theory that he had committed an offense that would have been a fourth-degree felony if committed by an adult.

**{6}** Before trial, the State filed two motions in limine relevant to this appeal, both of which were heard as preliminary matters on the day the parties appeared for the scheduled jury trial. The first, "State's Motion in Limine for Legal Determination that the Knife Is a Deadly Weapon," included as an exhibit a photograph of the pocketknife taken from Nick.

The motion sought to have the court rule as a matter of law that the depicted item fit the statutory definition of "deadly weapon" under Section 30-1-12(B) and rule that the jury could not be allowed to make that determination. In granting the motion and taking the issue from the jury, the court rejected defense counsel's argument that the jury should determine whether the statutory deadly weapon definition had been met, based on the nature of the object and its manner of actual or intended use in the circumstances.

**{7}**     A related motion was the "State's Motion in Limine to Exclude Any Reference to a Use Requirement," which argued that not only should the court make a pretrial determination that the particular pocketknife was per se a deadly weapon under the statute, but that defense counsel should be prohibited from making any argument to the jury regarding Nick's actual or intended use of the pocketknife. In granting the State's motions, the Children's Court judge commented from the bench:

> So, it's not the intended use of the instrument, it's just the fact that you have it and you shouldn't. Simple as that. So, I don't think the use of it or the intended use has any bearing in this case. He either had it on him or carried it on school grounds or he didn't. I don't know what else—that's what the jury's got to hear.

> They can't hear that he didn't intend to use it, he wasn't going to use it, because everybody could argue that, whether they intend to or not.

**{8}**     Following the court's rulings on the motions in limine, defense counsel moved that the issues be certified for an interlocutory appeal, given the fact that there were no other triable issues to submit to the jury. The court denied the request. The parties then conferred and arrived at a conditional plea agreement that preserved Petitioner's right to appellate review of the pretrial rulings in limine.

**{9}**     In an unpublished memorandum opinion, the Court of Appeals affirmed the Children's Court rulings, holding that simple possession of a pocketknife on school premises constitutes criminal possession of a deadly weapon as a matter of law, regardless of the possessor's actual or intended use. *Nick R.*, No. 27,145, slip op. at 2-3.

**{10}**     The case comes before us on certiorari to review the Court of Appeals' conclusion that "[b]ecause Child was carrying a knife, which is defined as a deadly weapon, there is no requirement that the State show that he intended to use it as a weapon." *Id.* at 3.

## II.     STANDARD OF REVIEW

**{11}**     Statutory construction is a matter of law we review de novo. *State v. Rivera*, 2004-NMSC-001, ¶ 9, 134 N.M. 768, 82 P.3d 939. Our primary goal is to ascertain and give effect to the intent of the Legislature. *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064. In doing so, "we examine the plain language of the statute as well as the

context in which it was promulgated, including the history of the statute and the object and purpose the Legislature sought to accomplish." *Maes v. Audubon Indem. Ins. Group*, 2007-NMSC-046, ¶ 11, 142 N.M. 235, 164 P.3d 934; *see Hovet v. Allstate Ins. Co.*, 2004-NMSC-010, ¶ 10, 135 N.M. 397, 89 P.3d 69. We must take care to avoid adoption of a construction that would "render the statute's application absurd or unreasonable" or "lead to injustice or contradiction." *N.M. State Bd. of Educ. v. Bd. of Educ.*, 95 N.M. 588, 591, 624 P.2d 530, 533 (1981).

## III.  DISCUSSION

**{12}**   Article 7 of the New Mexico Criminal Code, "Weapons and Explosives," contains several statutes imposing criminal sanctions for unlawfully carrying deadly weapons. Section 30-7-1, provides with respect to all those statutes that "'[c]arrying a deadly weapon' means being armed with a deadly weapon . . . or in close proximity thereto, so that the weapon is readily accessible for use." NMSA 1978, § 30-7-1 (1963); *see State v. Salazar*, 1997-NMCA-043, ¶¶ 8, 10, 123 N.M. 347, 940 P.2d 195 (holding that the term "carrying" does not have a broader meaning in connection with carrying a weapon on school grounds; whether the defendant was carrying a deadly weapon was a factual determination to be made by a jury in school ground cases, in the same manner as in prosecutions under other statutes criminalizing the carrying of a deadly weapon).

**{13}**   The basic crime of unlawful carrying of a deadly weapon is contained in NMSA 1978, Section 30-7-2(A) (2001), which imposes a petty misdemeanor criminal penalty of up to six months in jail, and NMSA 1978, § 31-19-1(B) (1984), for carrying "a concealed loaded firearm or any other type of deadly weapon anywhere, except" in one's automobile for personal protection, on one's real property, with a concealed firearms permit, or by a peace officer.

**{14}**   In addition to this generally applicable weapons-carrying crime, Article 7 also contains statutes providing heightened criminal penalties for carrying deadly weapons in particular contexts, such as authorizing a full misdemeanor jail sentence of up to a year, NMSA 1978, § 31-19-1(A) (1984), for carrying any deadly weapon on a bus, NMSA 1978, § 30-7-13 (1979), and a felony prison sentence of up to eighteen months for carrying any deadly weapon on school grounds, § 30-7-2.1, the criminal charge involved in this case. *See* NMSA 1978, § 31-18-15(A)(10) (2005, prior to 2007 amendment).

**{15}**   Although neither Section 30-7-2.1 nor any other statute in Article 7 contains any further definition of what is meant by the recurring term "deadly weapon," the courts below and the parties have recognized that the definition applicable to those statutes is contained in Section 30-1-12(B), the Criminal Code's uniform definition of the term, applicable to a broad range of offenses involving both use and possession of deadly weapons. *See State v. Traeger*, 2001-NMSC-022, ¶ 10, 130 N.M. 618, 29 P.3d 518 (interpreting Section 30-1-12(B) in the context of a charge of aggravated battery with a baseball bat as a deadly weapon); *State v. Fernandez*, 2007-NMCA-091, ¶¶ 6, 8-9, 142 N.M. 231, 164 P.3d 112

(interpreting Section 30-1-12(B) in the context of a charge of armed robbery with a BB gun as a deadly weapon); *State v. Galaz*, 2003-NMCA-076, ¶¶ 4, 9-10, 133 N.M. 794, 70 P.3d 784 (interpreting Section 30-1-12(B) in the context of a probation revocation for possession of bullets as deadly weapons); *State v. Anderson*, 2001-NMCA-027, ¶¶ 10, 14, 130 N.M. 295, 24 P.3d 327 (interpreting Section 30-1-12(B) in the context of a charge of aggravated stalking with a stick as a deadly weapon); *State v. Blea*, 100 N.M. 237, 238-39, 668 P.2d 1114, 1115-16 (Ct. App. 1983) (interpreting a similar city ordinance in the context of a charge of unlawful carrying of a voltage tester as a deadly weapon). We therefore must analyze the proper interpretation of this uniform statutory definition of deadly weapons in light of its multiple intended applications.

## A.    Statutory Language Analysis

**{16}**    The first step in any statutory construction is to try "to determine and give effect to the Legislature's intent" by analyzing the language of the statute. *Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 9, 146 N.M. 24, 206 P.3d 135. The "deadly weapons" definitional statute, which includes specifically named weapons and several generic catchalls, neither refers to a pocketknife in particular nor to all knives in general. While it includes "any firearm, whether loaded or unloaded," it does not include "any knife." *See* § 30-1-12(B). Instead, Section 30-1-12(B) clearly designates by name a number of specific kinds of knives as included within its definition of deadly weapon: "daggers . . . switchblade knives, bowie knives, poniards, butcher knives, dirk knives . . . swordcanes, and any kind of sharp pointed canes."

**{17}**    Because a common pocketknife is not mentioned in the statute, we consider whether the Legislature intended to give it the same status as the specifically named weapons through application of the three general catchall clauses in the statute: (1) "any weapon which is capable of producing death or great bodily harm," (2) "and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted," and (3) "or any other weapons with which dangerous wounds can be inflicted." Section 30-1-12(B). The State argues that the Court of Appeals was correct in interpreting the phrase "and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted" as reflecting a legislative intent to include pocketknives as per se deadly weapons.

**{18}**    Because all of the catchalls relate specifically to "weapons" rather than a more inclusive term such as "items" or "instruments," we must address what the Legislature meant by its use of the term "weapons." That term is not defined separately in the statutes, and we therefore must consider the ordinary meaning most likely to have been in the minds of the enacting legislators. *See State v. Gutierrez*, 2007-NMSC-033, ¶ 30, 142 N.M. 1, 162 P.3d 156 (interpreting the intended meaning of words used by the Legislature by consulting dictionaries to ascertain their "ordinary meaning"). The dictionary definitions of "weapon" focus on an object's use or intended use against another. *See, e.g.*, *Webster's Third New International Dictionary* 2589 (1976) ("an instrument of offensive or defensive combat");

5

*Black's Law Dictionary* 1624 (8th ed. 2004) ("An instrument used or designed to be used to injure or kill someone"). The Court of Appeals recently reaffirmed the applicability of this mode of interpretation in *State v. Neatherlin*, 2007-NMCA-035, ¶ 15, 141 N.M. 328, 154 P.2d 703: "This Court has previously relied on the definition of 'weapon' from *Black's Law Dictionary* 1593 (6th ed. 1990): 'An instrument of offensive or defensive combat, or anything used, or designed to be used, in destroying, defeating, threatening, or injuring a person.'" (internal quotation marks and citation omitted).

**{19}** The definitions of the specific items named in the statute emphasize that the Legislature must have had in mind instruments used or carried for use in injuring or killing people when it repeatedly used the term "weapons." *See, e.g.*, 8 *Oxford English Dictionary* 95 (2d ed. 1989) (defining "poniard" as "[a] short stabbing weapon"); 4 *Oxford English Dictionary*, *supra*, at 214 (defining "dagger" as "[a] short stout edged and pointed weapon, like a small sword, used for thrusting and stabbing"); *Webster's Third New International Dictionary*, *supra*, at 642 (defining "dirk" as "a long straight-bladed dagger"); *id.* at 2314 (defining "sword cane" as "a cane or walking stick that conceals the blade of a sword or dagger"); *id.* at 2314 (defining "sword" as "a weapon with a long blade for cutting and thrusting"); *id.* at 262 (defining "bowie knife" as "a large hunting knife adapted esp. for knife-fighting and common in western frontier regions").

**{20}** The striking characteristic of all the inherently dangerous items identified by name in the statute is that they are generally carried on one's person for their utility as offensive or defensive weapons. In contrast, no definition of "pocketknife" we have found refers to it as a "weapon" or refers to its having a purpose of use against other human beings. *See id.* at 1747 (defining "pocketknife" simply as "a knife with a blade folding into the handle to fit it for being carried in the pocket").

**{21}** New Mexico courts have long recognized the *ejusdem generis* principle of statutory construction, that where general words follow words of a more specific meaning, "the general words are not construed in their widest extent but are instead construed as applying to persons or things of the same kind or class as those specifically mentioned." *State v. Foulenfont*, 119 N.M. 788, 791, 895 P.2d 1329, 1332 (Ct. App. 1995) (internal quotation marks and citation omitted); *see id.* at 790-91, 895 P.2d at 1331-32 (declining to interpret a chainlink fence as a "structure" as meant in the burglary statute, which criminalizes unlawful entry into "any vehicle, watercraft, aircraft, dwelling or other structure, movable or immovable" (internal quotation marks and citation omitted)); *see also State ex rel. Murphy v. Morley*, 63 N.M. 267, 269, 317 P.2d 317, 318-19 (1957) (applying the principle to hold that "lewdness," as meant by a statute defining a sanctionable nuisance as "any place upon which lewdness, assignation or prostitution, is conducted," did not include the showing of pornographic films or other acts "not connected with assignation or prostitution") (internal quotation marks and citation omitted). The meaning of "weapons" in the catchall phrases thus would necessarily share the attributes of the items specifically named, that is, inherently dangerous items that either are carried for use or are actually used to inflict injuries on people.

6

**{22}** The application of this concept of statutory construction to this case is made inescapable by the Legislature's use of the adjective "such" before "weapons" in the generic phrase relied on by the State, which is found immediately after the itemization of prohibited kinds of knives: "and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted." Section 30-1-12(B). The word "such" has the same meaning in legal analysis as it does in other linguistic applications. *See* 17 *Oxford English Dictionary*, *supra*, at 102 (defining "such" as "[o]f the same kind or class as something mentioned or referred to; of that kind; similar, the like"); Bryan A. Garner, *A Dictionary of Modern Legal Usage* 849 (2d ed. 1995) ("*Such* is properly used as an adjective when reference has previously been made to a category of persons or things: thus *such* = of this kind, not *this*, *these* or *those*."). The use of the word "such" in this definitional statute underscores that the generic catchall is directed to the same kind of things specifically named, instruments carried for use, or actually used, to injure or kill people.

**{23}** Significantly, the statute names only one kind of knife that folds for carrying in a pocket, the weapon known as a "switchblade," which is commonly defined as "a pocketknife having the blade spring-operated so that pressure on a release catch causes it to fly open," *Webster's Third New International Dictionary*, *supra*, at 2314, and which is defined further in our statutes as a

> knife which has a blade which opens automatically by hand pressure applied to a button, spring or other device in the handle of the knife, or any knife having a blade which opens or falls or is ejected into position by the force of gravity or by any outward or centrifugal thrust or movement.

NMSA 1978, § 30-7-8 (1963). It is difficult to imagine that the Legislature could have meant to include all pocketknives when it not only did not name them but at the same time expressly named only one narrowly specialized type of folding pocketknife that is designed for quick use in a knife fight. "The age-old Latin phrase *inclusio unius est exclusio alterius* is applicable here. It means the inclusion of one thing is the exclusion of the other. The legislature did not see fit to include it in the statute, therefore it is excluded." *City of Santa Rosa v. Jaramillo*, 85 N.M. 747, 749-50, 517 P.2d 69, 71-72 (1973) (applying the concept to the scope of a permissible liquor license transfer).

**{24}** Even though we can find nothing in the plain wording of the statute that reflects any expression of legislative intent to criminalize the carrying of a common pocketknife, out of caution we also have traced the statute's long history in New Mexico law.

**B.    Statutory History**

**{25}** To understand fully the intended meaning of a statute describing what the State in its briefing understandably refers to as a "quaint collection" of nineteenth century weapons such as poniards and dirk knives and swordcanes, it is important to trace the statute's origins and development.

**{26}** The statutory use of the term "deadly weapon" in New Mexico law dates back to the earliest territorial days, and it began with concerns about the actual use, rather than mere possession, of deadly weapons. The rather sparse collection of criminal statutes first set forth in Territorial New Mexico's 1846 Kearny Code provided no definition of the term "deadly weapon," although it did contain one deadly weapon offense, assault with a deadly weapon. Kearny Code of Laws (1846), *Crimes and Punishments*, art. III, § 7; *see Territory v. Sevailles*, 1 N.M. 119, 123, 1855 WL 2214, at *1 (1855) (holding that an indictment charging assault with intent to kill with an undescribed knife was insufficient under the statute because of its failure to allege that the assault was committed with a deadly weapon).

**{27}** In 1869, the New Mexico Territorial Legislative Assembly enacted the comprehensive statutory definition of the term "deadly weapons" that formed the basic framework of the modern definition. 1868-69 N.M. Laws, ch. 32, §§ 1-16. The Act made it a crime for people "to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory," other than on their own real property, *id.* § 1, or while traveling between settlements or towns. *Id.* § 11. Hotels, boarding houses, and saloons were required to post notices that travelers were required to divest themselves of their deadly weapons within one hour of their arrival in a town. *Id.* § 12. Section 7 provided that "where the words 'weapons' or 'deadly weapons' are used in this act, such word or words shall be construed to mean the weapons described in section two of this act." *Id.* § 7. Section 2 contained the first statutory articulation of the definition that has been carried forward with little change for almost a century and a half into New Mexico's current criminal code:

> Deadly weapons, in the meaning of this act, shall be construed to mean all kinds and classes of pistols whether the same be a revolver, repeater, derringer, or any other kind or class of pistol; any and all kinds of bowie knives, daggers, poniards, butcher knives, dirk knives, and all such weapons with which cuts can be given, or by which wounds can be inflicted by thrusting, including sword canes and such sharp pointed canes with which deadly thrusts can be given, and all kinds of slung shots, and any other kinds of deadly weapon, by whatever name it may be called, by which a dangerous wound can be inflicted.

*Id.* § 2.

**{28}** The only material alteration of the definition of "deadly weapons" since territorial days was the addition of two more modern weapons, switchblade knives and brass knuckles, in 1953. NMSA 1953, § 40A-1-13(B) (Vol. 6, 2d Repl.). The specific addition of the switchblade in a later statutory amendment is of particular significance to the issues in this case. If folding pocketknives already had been included in the catchall language that had existed for over half a century, the amendment that added the switchblade, a very specialized folding pocketknife, would have been superfluous. This Court has long held that we must avoid constructions of statutory amendments that "would render the change unnecessary and

8

meaningless." *State v. Romero*, 73 N.M. 109, 115, 385 P.2d 967, 970 (1963) (applying the principle to a change in criminal sentencing statutes). Indeed, if the statute made all pocketknives prohibited weapons without regard to their actual or intended use, the Court of Appeals need not have gone to the effort of trying to determine whether a quick-release butterfly knife qualified as a switchblade in *State v. Riddall*, 112 N.M. 78, 79-80, 811 P.2d 576, 577-78 (Ct. App. 1991). *See id.* at 82, 811 P.2d at 580 (determining that a butterfly knife fit the statutory definition of a switchblade and therefore was a "deadly weapon" under the statute).

## C.    Judicial Interpretations

**{29}**    The first reported appellate opinion to construe the statutory definition of "deadly weapon," interestingly in the context of its application to a pocketknife, was *Territory v. Armijo*, 7 N.M. 571, 577-78, 37 P. 1117, 1118 (1894). By that time, the definition had been slightly amended by the Deadly Weapon Act of 1887 to resemble even more closely the current wording, primarily by adding the adjective "dangerous" before the nouns "cuts" and "thrusts":

> Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolver, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted.

1887 N.M. Laws, ch. 30, § 8.

**{30}**    In *Armijo*, the defendant was charged with assault with a deadly weapon and was alleged to have used a pocketknife to "cut, stab, and wound" the victim. *Id*. at 574, 37 P. at 1117. Our Territorial Supreme Court held that the indictment was fatally flawed because it failed to set forth how "the kind or character of the knife" was a deadly weapon as defined in the statute. *Id*. at 577, 37 P. at 1118. The Court concluded that while many ordinary knives may become deadly weapons by virtue of their use in a particular case, not all knives are automatically "deadly weapons" as a matter of law. *Id*. Of particular relevance to the issue before us, the Court addressed whether a pocketknife could be considered a per se deadly weapon under the statutory definition:

> It is evident that the kind and character of the knife should be described as one of the class therein mentioned. The word "such" qualifies the kind of knives, and the knife used, to bring the offense within the act, must belong to that class. It was never intended by the legislature to include in the class named ordinary pocket knives as deadly weapons.

9

*Id.* at 578, 37 P. at 1118. No case has ever overruled or even criticized *Armijo*'s substantially contemporaneous holding that "[i]t was never intended by the legislature to include . . . ordinary pocket knives as deadly weapons." *Id.*

**{31}** It should not be surprising that the *Armijo* Court would find unacceptable the notion that the Legislature had intended to criminalize possession of an ordinary pocketknife in the same manner as firearms or knives commonly carried for their usefulness as deadly weapons. Apparently, penknives and other folding pocketknives were commonly possessed by persons of all ages in the era when the statute was enacted. *See, e.g.*, *Sevailles*, 1 N.M. at 124, 1855 WL at *3 (Brocchus, J., dissenting) (referring to knives "commonly in use" which "a gentleman would carry in his pocket for the harmless purpose of making pens").

**{32}** Mark Twain, America's popular chronicler of nineteenth century frontier life, repeatedly mentioned the ubiquitous Barlow pocketknives in his classic Tom Sawyer and Huckleberry Finn books. *See* Mark Twain, *The Adventures of Tom Sawyer* 30-31 (Harper & Brothers 1920) (1875) ("Mary gave [Tom] a brand-new 'Barlow' knife worth twelve and a half cents; and the convulsion of delight that swept his system shook him to his foundations. True, the knife would not cut anything, but it was a 'sure-enough' Barlow, and there was inconceivable grandeur in that . . . ."); *id.* at 276 (looking for buried treasure, "Tom's 'real Barlow' was out at once, and he had not dug four inches before he struck wood"); Mark Twain, *The Adventures of Huckleberry Finn* 70 (Harper & Brothers 1912) (1884) (stocking their canoe for a river trip, Tom and Huck "got an old tin lantern, and a butcher-knife without any handle, and a bran-new Barlow knife worth two bits in any store"); *id.* at 193 ("There was empty dry-goods boxes under the awnings, and loafers roosting on them all day long, whittling them with their Barlow knives . . . .").

**{33}** For over a century since *Armijo* was decided, numerous other cases have illuminated the issues before us in the course of construing the definition in a variety of contexts, most often in cases where the object was actually used as a weapon. In *State v. Conwell*, 36 N.M. 253, 255, 13 P.2d 554, 555 (1932), the defendant was convicted by a jury of actual assault with a deadly weapon, not its mere possession. The alleged weapon used to beat the victim was a four-inch-long rock. *Id.* at 254, 13 P.2d at 555. The defendant argued before this Court that there was insufficient evidence to support a jury finding that the rock used on the victim's face was a deadly weapon, as defined in the statutory catchall of "bludgeons or any other deadly weapons with which dangerous wounds can be inflicted." *Id.* at 255, 13 P.2d at 555. In language that is instructive here, *Conwell* held that "[w]here the instrument used is not one declared by the statute to be a deadly weapon, it is ordinarily a question for the jury to determine whether it is so, considering the character of the instrument and the manner of its use." *Id.* The Court noted with approval that the rock had been passed among the jurors, "enabling them to know its dimensions, weight, sharpness of its edges, and potentiality for infliction of dangerous wounds from the manner in which it was claimed to have been used." *Id.* at 255-56, 13 P.2d at 556.

**{34}** In *State v. Mitchell*, 43 N.M. 138, 139-40, 87 P.2d 432, 433 (1939), the defendant

10

was charged with assaulting a victim "with a certain deadly weapon, to-wit: a certain knife, with which dangerous cuts could be given, and with which dangerous wounds and thrusts could be inflicted." *Mitchell* endorsed *Conwell*'s application of the "well settled rule" that where an instrument is not specifically named in the statute as a deadly weapon, whether it is an unlawful deadly weapon is a fact question for the jury to resolve by considering the instrument's use by an accused and the other circumstances of a particular case. *Id.* at 140, 87 P.2d at 433.

**{35}** This approach has been recognized and applied repeatedly over the years in a long line of opinions by the courts of this State up to the present day. *See, e.g.*, *State v. Martinez*, 57 N.M. 174, 176, 256 P.2d 791, 792 (1953) (holding that it was for the jury to determine whether a knife with a two-inch blade was a deadly weapon as used by the defendant in the circumstances of the case); *State v. Gonzales*, 85 N.M. 780, 781, 517 P.2d 1306, 1307 (Ct. App. 1973) (concluding that because the statute does not specifically define a tire tool as a deadly weapon, the determination whether the tool was a deadly weapon in the context of a robbery prosecution was for the jury).

**{36}** Although fewer in number than the actual use cases, the simple possession cases follow a similar approach, holding the jury must determine whether the accused had the "intent to carry or to use the [unlisted] object as a weapon." *Blea*, 100 N.M. at 239, 668 P.2d at 1116. In *Blea*, the Court of Appeals reversed a conviction for simple possession of a voltage tester, even though it could have been used to stab someone:

> A voltage tester, or other utilitarian tool or object is not per se a weapon; it may, however, become a weapon by its actual use . . . or by the purpose for which it is carried. Hence, a factual finding as to defendant's intent or purpose in carrying the object is necessary to determine guilt or innocence of an accused charged with carrying a concealed article not expressly listed as a deadly weapon . . . .

*Id.* (internal citations omitted); *see also Anderson*, 2001-NMCA-027, ¶ 32 (reversing a conviction for carrying a stick as a deadly weapon and thereby committing the offense of aggravated stalking).

> [W]hen the object or instrument in question is an unlisted one that falls within the catchall language of Section 30-1-12(B), the jury must be instructed (1) that the defendant must have possessed the object or instrument with the intent to use it as a weapon, and (2) the object or instrument is one that, if so used, could inflict dangerous wounds.

*Id.*

**{37}** In short, our cases hold that in an actual use case involving an unlisted weapon, the jury must find, among other elements, that an object was actually used as a weapon and that

11

it was capable of causing the wounds described in the statute. In a simple possession case, the jury must find that the object was possessed with intent to carry it as a weapon and that it was capable of causing the wounds described in the statute. These are determinations that cannot be ruled on by a trial court as a matter of law and taken from the jury's consideration, no matter how obvious the existence of any essential element of an offense may seem. It is impermissible to enter a "partial directed verdict" against a defendant because it is "the fundamental right of a criminal defendant to have the jury determine whether each element of the charged offense has been proved by the state beyond a reasonable doubt." *State v. Orosco*, 113 N.M. 780, 786, 833 P.2d 1146, 1152 (1992) (determining that a trial court had not removed an essential element of an offense from a jury's consideration in a sex offense prosecution).

{38} We have found no New Mexico case that has ever interpreted the "deadly weapons" definitional statute inconsistently with this large body of precedent. Neither court below ever addressed the statutory history or the relevant New Mexico case law interpreting and applying the "deadly weapon" definition. Instead, the Court of Appeals cited this Court's opinion in *State v. Baca*, 114 N.M. 668, 674, 845 P.2d 762, 768 (1992), in support of its position that the public policy of ensuring safety for certain segments of the population eliminated any "use requirement" in certain weapons possession crimes. *Nick R.*, No. 27,145, slip op. at 4. Neither *Baca* nor any other precedent has stood for that proposition. The issue in *Baca* had nothing to do with the statutory definition of "deadly weapon" or its proof requirements. The only issue in *Baca* was whether a defendant could avail himself of a duress defense against a charge of intentional possession of a conceded deadly weapon, a purposeful weapon known as a "shank," by a prison inmate who claimed he needed to arm himself for self-defense. 114 N.M. at 673-74, 845 P.2d at 767-68.

{39} Similarly, *State v. Padilla*, 1996-NMCA-072, 122 N.M. 92, 920 P.2d 1046, did not analyze the statutory definition of "deadly weapon." Instead, it specifically addressed whether stealing and carrying away a deadly weapon constituted "arming" oneself during a burglary. *Id.* ¶ 1. The opinion therefore never had occasion to address what proof would have been necessary if there had been an issue as to whether the item possessed met the statutory definition of a deadly weapon.

{40} New Mexico's case law is consistent with that of other jurisdictions, which routinely distinguish between legislatively designated per se deadly weapons and a vast array of tools and other ordinary items that could become deadly weapons if used offensively. *See, e.g.*, *Grass v. People*, 471 P.2d 602, 605 (Colo. 1970) (shoe as deadly weapon); *Timm v. State*, 644 N.E.2d 1235, 1238-39 (Ind. 1994) (plastic flashlight); *Johnson v. State*, 455 N.E.2d 932, 936 (Ind. 1983) (automobile); *State v. Kelly*, 571 A.2d 1286, 1292-93 (N.J. 1990) (carpet-cutting razor); *People v. Elijah B.*, 813 N.Y.S.2d 405, 406 (N.Y. App. Div. 2006) (work boots); *People v. Buhagiar*, 713 N.Y.S.2d 114, 115 (N.Y. App. Div. 2000) (pestle); *Bald Eagle v. State*, 355 P.2d 1015, 1017 (Okla. Crim. App. 1960) (beer bottle); *Strahan v. State*, 284 P.2d 744, 749 (Okla. Crim. App. 1955) (metal automobile window crank); *State v. Barrientos*, 444 N.W.2d 374, 377 (S.D. 1989) (race car); *Bui v. State*, 964 S.W.2d 335, 342

12

(Tex. Crim. App. 1998) (Duraflame log); *Broom v. State*, 242 S.W. 236, 238 (Tex. Crim. App. 1922) (breast yoke of a wagon); *State v. Bodoh*, 595 N.W.2d 330, 333 (Wis. 1999) (dog). Our own actual use cases have included such situational deadly weapons as a human mouth, a trivet, a brick wall, and a screwdriver. *See Neatherlin*, 2007-NMCA-035, ¶¶ 13, 15 (reviewing precedents and concluding that the statutory catchall language "is broad enough to include an individual's mouth" in the factual context of a particular case).

**{41}** This Court recently reaffirmed the long-standing approach of New Mexico case law "that it effectuates the legislative intent to give Section 30-1-12(B) a narrow construction." *Traeger*, 2001-NMSC-022, ¶ 12. In *Traeger*, we held that because a baseball bat was not specifically named in the statute as a deadly weapon per se, it was for the jury to decide whether a baseball bat was sufficiently dangerous to be a "deadly weapon" when used in an aggravated battery. *Id.*; *see also* ¶ 26 ("[W]e retain the rule that if the item is not specifically listed in Section 30-1-12(B), then a jury should make that determination considering the character of the instrument and manner of its use.").

**{42}** Of particular significance to the case at bar, *Traeger* cautioned that if this Court were to make a baseball bat a per se deadly weapon under the general definitional statute in the Criminal Code, it would have far-reaching implications for other statutes and would criminalize the mere carrying of a bat in a variety of situations. *Id.* ¶ 15. "We believe that to criminalize the carrying of a baseball bat, without a jury finding that the baseball bat was a deadly weapon and that the baseball bat was in fact being carried because it could be used as a weapon, is incongruent with New Mexico law." *Id.*

**{43}** *Traeger*'s concerns apply with equal force here. If we were to hold that a pocketknife is a per se deadly weapon, it would mean a person who carried one at work, on a fishing trip, or virtually anywhere else would commit the criminal offense of carrying a deadly weapon, in violation of Section 30-7-2. It would increase that statute's potential six-month penalty to a potential jail sentence of up to a year if the defendant took a bus to work while carrying the pocketknife, under the provisions of Section 30-7-13. And in this case, if Nick's father had gone to pick his son up at school or had gone to a parent-teacher conference with his own utilitarian work knife in his pocket, he could have been imprisoned and lost his civil rights for the felony of carrying a deadly weapon on school premises, under the terms of the same statute that was applied to Nick below. Indeed, the same far-reaching theory could result in criminal liability for innocently possessing any of the tools, other objects, and even body parts that have been found to constitute deadly weapons when used offensively. We simply cannot attribute to the Legislature any such unexpressed objectives in enacting New Mexico's deadly weapons statutes.

### D.    School Security Concerns

**{44}** In 1994, when the Legislature enacted the statute making it a felony to possess deadly weapons on school grounds, it neither created a new definition of "deadly weapons" for use in school cases nor amended in any way the existing general definition in the Criminal Code.

*Cf. State v. Salazar*, 1997-NMCA-043, ¶ 9, 123 N.M. 347, 940 P.2d 195 ("We believe the legislature intended [in Section 30-7-1] that its definition of carrying a deadly weapon would apply to all statutes making it a crime to carry a deadly weapon, whether concealed or on school premises.") *Doe v. State ex rel. Governor's Organized Crime Prevention Comm'n*, 114 N.M. 78, 80, 835 P.2d 76, 78 (1992) (stating that the Legislature is presumed to know about existing laws and cannot be inferred to have enacted a law inconsistent with an existing law). The Legislature simply expanded the existing criminal consequences for carrying a deadly weapon, from petty misdemeanor to fourth-degree felony penalties, if the crime was committed on school grounds. It expressed no intention whatsoever to change the definition of a deadly weapon.

**{45}** We are sensitive to the concern expressed by the State that "the social problem of deadly weapons in the schools is certainly more formidable and intractable than it was in 1855." This Court, however, must be careful not to intrude on the exclusive legislative prerogative to take those kinds of arguments into account in deciding whether an existing statute should be changed. Whether or not concerns of security arguably might now justify criminalizing the simple possession of potentially dangerous utilitarian tools on school grounds, "this Court is not the entity charged with the modernization of the relevant statute." *Traeger*, 2001-NMSC-022, ¶ 14 (declining to add a baseball bat as a modern expansion of the historical bludgeon included in the definition).

**{46}** Nor is anything in this opinion intended to impair the existing authority of school authorities to promulgate and enforce administrative security measures of the kind the Taos School Superintendent expeditiously employed in this case before the District Attorney filed charges under the criminal statutes. *See, e.g.*, Taos High School, *Student Behavior Policy*, in *Handbook* §§ IV(A)-(B)(1), VI(A)(2)(p)-(q) (2008) (listing both possession of a weapon of any kind and possession of a pocketknife among specific examples of behavior that may result in school disciplinary action); Santa Fe Public Schools, *Board of Education Policy Manual* §§ 336-3 to -4, 347-1 (2002) (prohibiting possession of "any firearm, knife . . . or other object, even if manufactured for a nonviolent purpose, that has a potentially violent use, or any 'look-a-like' object that resembles an object that has a potentially violent use, if, under the surrounding circumstances, the purpose of keeping or carrying the object is for use, or threat of use, as a weapon"); Albuquerque Public Schools, *Student Behavior Handbook: 2008-2009* 11, 25 (2008) (prohibiting possession of, among other items, "a firearm, any type of gun, knife, club . . . that may cause or is intended to cause injury or death"). The Legislature has specifically mandated minimum one-year expulsions of students who knowingly bring to school any firearms, explosives, or incendiary devices. NMSA 1978, § 22-5-4.7 (1995).

**{47}** "[P]ublic school officials [have] an effective means of disciplining unruly or disruptive pupils in an administrative fashion." *State v. Doe*, 92 P.3d 521, 525 (Idaho 2004); *see also In re Julio L.*, 3 P.3d 383, 385 (Ariz. 2000) (en banc) ("[N]ot every violation of public decorum or of school rules gives legal cause for criminal adjudication . . . .").

14

**{48}** Whatever the Legislature or school officials may choose to do in defining and sanctioning weapons violations in their respective spheres of authority, the courts are simply not invested with substantive policy-making authority to create those policies. It is the duty of the judicial branch to enforce the lawful policies established by the political branches as they are written and intended. In this case, we follow a long and consistent interpretation of legislative intent in reaffirming that our Legislature has not chosen to define an ordinary pocketknife as a per se deadly weapon, without regard to either its actual or its intended use.

## IV.    CONCLUSION

**{49}** The Children's Court erred in denying Petitioner a jury determination of whether he intended to carry his pocketknife as a deadly weapon, as that term is defined in the applicable New Mexico statutes, and the Court of Appeals erred in holding that he had no right to such a jury resolution. We reverse the decision of the Court of Appeals and remand to the Children's Court for further proceedings in accordance with this Opinion.

**{50}    IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____
**EDWARD L. CHÁVEZ, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

**Topic Index for _State v. Nick R._, No. 30,657**

| CL | CRIMINAL LAW |
| --- | --- |
| CL-DW | Deadly Weapon |
| CL-SI | Specific Intent |
| CL-WO | Weapons Offenses |
| | |
| **ST** | **STATUTES** |
| ST-AP | Applicability |

ST-IP        Interpretation
ST-LI        Legislative Intent
ST-RC        Rules of Construction