This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                              **No. A-1-CA-36087**

**ALAN W. HENSLEY,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**Lisa B. Riley, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Walter M. Hart, III, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**VANZI, Chief Judge.**

{1}     A jury convicted Defendant Allen Hensley of aggravated battery (deadly

weapon), contrary to NMSA 1978, Section 30-3-5(A) (1969), and intimidation or bribery of a witness, contrary to NMSA 1978, Section 30-24-3(A)(3) (1997). Defendant argues on appeal that (1) the jury was not properly instructed on the elements of aggravated battery, (2) the evidence does not support his convictions, (3) the district court improperly denied his motion for a new trial, and (4) the district court should have reconsidered its sentence on Defendant's request. We reject Defendant's arguments and affirm his convictions and sentence.

**BACKGROUND**

{2}     Rebecca "Becky" Dinwiddie testified that she has been a friend of Mr. "Chuck" Gist (Mr. Gist) for ten years and a friend of Defendant's for fifteen to eighteen years. On the date of the incident, Ms. Dinwiddie arrived home from Albuquerque and was removing items from a friend's trunk when Defendant drove up close to her, very angry, and asked where he could find Mr. Gist. Ms. Dinwiddie told him she had not seen Mr. Gist. Defendant accused Mr. Gist of stealing from him and stated, "it don't make a difference, . . . he's gonna get this" and waved a knife back and forth in Ms. Dinwiddie's face. Ms. Dinwiddie described the knife as "not very big" and about three to four inches. Ms. Dinwiddie was scared and angry while Defendant was waving the knife. Defendant told Ms. Dinwiddie to tell Mr. Gist to "bring back whatever it was that he stole," and he drove away.

{3} Ms. Dinwiddie brought her belongings into the house and called Mr. Gist. Thirty minutes later, Ms. Dinwiddie was watching television when Defendant called and asked why she did not answer the door. Ms. Dinwiddie opened the door and Defendant entered, got "in [her] face," and said, "I see where your fucking loyalties lie." Defendant "dared" her to say something, and Ms. Dinwiddie told Defendant to get out of her house. Defendant did not touch Ms. Dinwiddie and did not have the knife in his hand at that time. Defendant left but Ms. Dinwiddie was angry and still scared.

{4} Approximately thirty minutes later, Defendant returned to Ms. Dinwiddie's house for the third time. She went to the door, Defendant was outside, and he said, "you might want to go to the hospital and check on your friend, Chuck." Ms. Dinwiddie told Defendant to leave, and Defendant repeated that she should check on Mr. Gist at the hospital. As he was leaving, Defendant said, "just everybody better keep it zipped, keep it quiet" and held his finger to his lips in a "shushing manner" and motioned his finger across his lips in a 'zipping' manner." After the third encounter, Ms. Dinwiddie felt "kind of scared" and "kind of mad." When asked why she did not call the police, Ms. Dinwiddie testified, "do you know what would happen to me if I called the cops on [Defendant]?" Ms. Dinwiddie reiterated that she was scared to call the police, and she was scared about what Defendant would do or say. When she

closed the door, Mr. Gist called. Mr. Gist told her that Defendant had just stabbed him. Ms. Dinwiddie picked up Mr. Gist's girlfriend and went to the hospital; however, she never saw Mr. Gist's wound because he had been treated by the time they arrived.

{5}     Mr. Gist testified that on the day of the incident, Defendant came to his house to talk. Mr. Gist and Defendant were not arguing and there was no animosity. After a while, Mr. Gist left to go to Lake Arthur to visit his other girlfriend. Defendant was still sitting in his truck in a nearby parking lot when Mr. Gist left. Mr. Gist stayed in Lake Arthur for a couple hours, and as he was driving home, Ms. Dinwiddie called him. Based on what Ms. Dinwiddie told him, Mr. Gist called Defendant to find out what was going on, and Defendant accused Mr. Gist of stealing "dope" from his truck. Defendant was screaming at Mr. Gist and threatening him, saying he was "coming to get [him] and coming to get [him] right now." Mr. Gist told Defendant he was going home.

{6}     Mr. Gist stopped at an Allsup's to buy cigarettes, and as he proceeded home, he noticed Defendant's truck following him. Mr. Gist stopped just past the railroad tracks and Defendant pulled his truck in front of Mr. Gist's truck, blocking Mr. Gist's from moving. Mr. Gist's headlights were shining into Defendant's vehicle, and Mr. Gist could see that Defendant was motioning as if he were putting his hands in gloves. Defendant got out and came to Mr. Gist's window, and the men screamed at each

4

other. Defendant returned to his vehicle and seemed to lie down on the seat and searched for something. Defendant then came back to Mr. Gist's vehicle and began punching into the window. Mr. Gist put his arm up to block the punches. Mr. Gist did not realize he had been stabbed until he saw a blade come through his arm.

{7} Mr. Gist put his hand in front of his face and saw a blade coming out of his arm. Defendant pulled the blade out but because it was dark and it happened so fast, Mr. Gist did not see the knife. Defendant then punched Mr. Gist in the face and knocked off his glasses. Mr. Gist could not move his fingers, was yelling at Defendant about his arm, and told him to get his truck out of the way. Holding his wrist, to try to stop the bleeding, Mr. Gist drove through a field to get to the hospital, as Defendant followed, motioning and waving his hands. Eventually, Mr. Gist turned right to go to the hospital, and Defendant turned left onto Bates Street toward Ms. Dinwiddie's house. Mr. Gist needed thirty stitches on one side of his arm and two stitches on the other side.

{8} At trial, Deputy Robert Smith, with the Eddy County Sheriff's Office, testified that he was dispatched to the area of Maple and Ritchie to investigate a report of a stabbing in that area, and he arrived at the scene around 2:40 a.m. No one was in the area when Deputy Smith arrived, but he identified a "wet spot" in the roadway, which he thought was blood because it looked red, and he located what looked like a "chunk

5

of flesh." Deputy Smith photographed the blood and chunk of flesh, and also photographed tire marks on the south side of the roadway, although he did not collect the evidence or any samples, did not analyze the tire tracks, and did not locate a weapon.

{9} Deputy Luis Ortega was dispatched to the hospital and made contact with Mr. Gist in the emergency room. Deputy Ortega photographed Mr. Gist's wound before it was treated and sewn closed, and those photographs were admitted as State's Exhibits 6-12. State's Exhibit 8 shows an arm and hand, with palm facing down, and a straight cut above the wrist. State's Exhibit 10 shows an arm and hand, with palm facing up, and a slice—longer than the cut on the other side of the arm—gaping open on the arm just above the wrist. Deputy Ortega also photographed Mr. Gist's truck, which showed blood on the outside of the truck's door, below the door handle, blood on the inside of the truck's door and inside the door frame, and blood on the steering wheel. No knife was discovered in the vehicle or was ever recovered.

{10} Prior to instructing the jury, defense counsel said that he had reviewed the proposed instructions and that he did not have any objections to them. The district court noted that no instruction defined "deadly weapon," and the parties stated that no uniform jury instruction provided the definition. The State offered to copy the definition from the statute, and Defendant agreed that the definition would "be

6

helpful." The district court instructed the jury on aggravated battery (deadly weapon) and provided the statutory definition of "deadly weapon," without objection. *See* § 30-3-5(A). The jury found Defendant guilty of aggravated battery (deadly weapon) and bribery of a witness, and not guilty of aggravated assault (deadly weapon).

{11} After trial, defense counsel filed a motion to continue the sentencing hearing because Defendant "would like a motion for a [n]ew [t]rial." Pursuant to the motion for continuance, Defendant's family delivered Defendant's phone to the public defender office, but the phone did not have a call log and counsel needed to subpoena phone records in order to investigate the grounds for a motion for new trial. Defense counsel filed the motion for new trial on September 27, 2016. In the motion, Defendant stated that although Ms. Dinwiddie and Mr. Gist had testified about calls placed between their phones and Defendant's phones on the date of the incident, the phone records showed no such calls were made.

{12} The district court held a hearing at which Joe Rodriguez, an investigator for the public defender's office, testified about his investigation for the motion for new trial. After trial, Defendant's father brought a cell phone to the public defender's office for analysis, which, according to Defendant was his only phone. Mr. Rodriguez testified that he reviewed phone company records from the phone company to look for calls made to and from Defendant's phone between 10:00 p.m. on April 26, 2015, and 5:00

7

a.m. on April 27, 2015. Mr. Rodriguez identified all of the telephone numbers that called Defendant and that Defendant called within that time period and compared those numbers with Defendant's contact list and a public-defender's office information system. Mr. Rodriguez additionally spoke with Defendant about the numbers. Mr. Rodriguez could not link any calls in the phone provided by Defendant's father to "Becky" or "Becky Dinwiddie" between 10:00 p.m. and 5 a.m. on the night in question. Mr. Rodriguez did not know whether the phone provided by Defendant's father was the phone that Ms. Dinwiddie called or from what phone Ms. Dinwiddie called Defendant. Defendant did, however, have contacts associated with Becky Dinwiddie in the phone that Mr. Rodriguez analyzed. When asked why he did not investigate the phone numbers before trial, Mr. Rodriguez explained that he works at the request of the attorneys, who guide the investigations.

{13}    Based on Mr. Rodriguez's testimony, defense counsel argued that Defendant was entitled to a new trial because the phone records established that Ms. Dinwiddie perjured herself. The district court denied the motion. Although the court found that there was "a possibility" that the evidence could change the result of the trial, it concluded that the evidence could have been discovered before trial because the phone calls were alleged in the affidavit to the criminal complaint and in witness interviews. The court noted as well that the evidence was only marginally material and was

essentially impeaching or contradictory evidence. The district court then continued to sentencing.

{14} Defendant filed a motion to reconsider sentence which stated, in its entirety:

> COMES NOW . . . Defendant, Alan Hensley, through counsel, Nathanael Banks, Assistant Public Defender, and moves the court to reconsider its sentence entered on November 3, 2016, and hereby requests a hearing before the court so that Defendant can provide testimony and make argument in support of reconsideration by the court.

The district court denied the motion without a hearing on December 2, 2016. This appeal followed.

**DISCUSSION**

{15} Defendant argues that the district court committed fundamental error in failing to require the jury to find that the instrument used to injure Mr. Gist was a deadly weapon. Defendant additionally contends that the evidence did not support his convictions, and the court abused its discretion by denying his motion for a new trial and refusing to reconsider his sentence. Finding no error, we affirm.

**Aggravated Battery Jury Instruction and Deadly Weapon**

{16} Defendant conceded that he did not object to any of the jury instructions including the one for aggravated battery. As a result, we review the given instruction for fundamental error. *See State v. Traeger*, 2001-NMSC-022, ¶ 18, 29 P.3d 518. "The doctrine of fundamental error allows an appellate court to review a criminal

conviction for errors that shock the conscience or implicate a fundamental unfairness within the system that would undermine judicial integrity if left unchecked." *Id.* (internal quotation marks and citation omitted). When reviewing jury instructions for fundamental error, the instructions are considered as a whole. *See Traeger*, 2001-NMSC-022, ¶ 20.

{17}    The uniform jury instruction for aggravated battery (deadly weapon) is as follows:

> For you to find the defendant guilty of aggravated battery with a deadly weapon [as charged in Count _____], the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1.    The defendant touched or applied force to _____ (*name of victim*) by _____ with a [_____][3] [deadly weapon. The defendant used a _____ (*name of instrument or object*). A _____ (*name of instrument or object*) is a deadly weapon only if you find that a _____ (*name of object*), when used as a weapon, could cause death or great bodily harm];
>
> 2.    The defendant intended to injure _____ (*name of victim*) [or another];
>
> 3.    This happened in New Mexico on or about the _____ day of _____, _____.

UJI 14-322 NMRA. Use Note 3 directs the user to insert the name of the weapon "only if the deadly weapon is specifically listed" in NMSA 1978, Section 30-1-12(B) (1963). Section 30-1-12(B) defines "deadly weapon" as

any firearm, whether loaded or unloaded; or any weapon which is capable of producing death or great bodily harm, including but not restricted to any types of daggers, brass knuckles, switchblade knives, bowie knives, poniards, butcher knives, dirk knives and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including swordcanes, and any kind of sharp pointed canes, also slingshots, slung shots, bludgeons; or any other weapons with which dangerous wounds can be inflicted[.]

{18} In *Traeger*, our Supreme Court explained that Section 30-1-12(B) "represents an identification by the Legislature of those items which are so inherently dangerous that it is unnecessary to have a jury determine the 'dangerous weapon' element." *Traeger*, 2001-NMSC-022, ¶ 12. If an item is listed in Section 30-1-12(B), "it is considered a deadly weapon as a matter of law." *Traeger*, 2001-NMSC-022, ¶ 12. If, however, "the character of the instrument and the manner of its use are necessary to determine whether an item is a deadly weapon, a jury should make that determination." *Id.* ¶ 13.

{19} Here, the district court instructed the jury as follows:

For you to find [D]efendant guilty of aggravated battery with a deadly weapon as charged in Count 1, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. [D]efendant touched or applied force to Charles Gist by stabbing him with a knife or blade;

2. [D]efendant intended to injure Charles Gist;

3. This happened in New Mexico on or about the 27th day of April, 2015.

As we have noted, the court also instructed the jury on the definition of "deadly weapon" exactly as stated in Section 30-1-12(B).

{20} On appeal, Defendant argues that the knife or blade used in the present case is not listed in Section 30-1-12(B), and the district court therefore incorrectly inserted the name of the weapon—"a knife or blade"—and did not instruct the jury to determine whether the instrument was a deadly weapon. The State responds that the instrument should be considered a "poniard" or "dagger," and therefore is within the *per se* weapons listed in Section 30-1-12(B). We disagree with the State. No evidence demonstrates what sort of knife or blade Defendant used. Ms. Dinwiddie testified that Defendant waved a three- to four-inch knife in her face, and Mr. Gist testified only that he saw the blade go through his arm. No evidence was presented establishing whether the knife was a pocketknife, a switchblade, letter opener, or a kitchen knife.

{21} *Traeger* is instructive. In that case, the State argued that a baseball bat was necessarily a bludgeon and therefore listed in Section 30-1-12(B). *Traeger*, 2001-NMSC-022, ¶ 9. The Court rejected the State's argument that the use of a baseball bat to bludgeon or as an instrument for hitting balls required the jury to evaluate "the character of the instrument and the manner of its use." *Id.* ¶¶ 13, 15. To hold otherwise, the Court explained, would result in a baseball bat always being a deadly weapon and would broadly criminalize the possession of a baseball bat, without

12

reference to the circumstances. *Id.* ¶ 15. Likewise, in this case, the State's argument would broadly criminalize the possession of any three- to four-inch knife or blade, not all of which are deadly weapons as a matter of law. *See State v. Nick R.*, 2009-NMSC-050, ¶¶ 23, 43, 147 N.M. 182, 218 P.3d 868 (holding that a pocket knife is not a per se deadly weapon, because it was not listed in Section 30-1-12(B) and identifying the far-reaching consequences of determining a pocket knife to be a *per se* deadly weapon); *State v. Radosevich*, 2016-NMCA-060, 376 P.3d 871 (declining to categorize a "small kitchen knife" as a deadly weapon as a matter of law), *rev'd on other grounds by State v. Radosevich*, 2018-NMSC-028, ¶ 34, 419 P.3d 176; *State v. Riddall*, 1991-NMCA-033, ¶¶ 3-19, 112 N.M. 78, 811 P.2d 576 (considering at length whether "butterfly knives" were "switchblades" under the possession of a deadly weapon statute).

{22}     The evidence in this case did not establish that the blade in question was a *per se* deadly weapon. Accordingly, the jury should have been instructed to determine that Defendant "touched or applied force" with a blade and that the "[blade] is a deadly weapon only if you find that a [blade], when used as a weapon, could cause death or great bodily harm[.]" UJI 14-322; *see Traeger*, 2001-NMSC-022, ¶ 16. As noted, the district court did not include this portion of the uniform instruction, and instead

simply instructed the jury to find that Defendant "touched or applied force to [Mr.] Gist by stabbing him with a knife or blade[.]" This was in error.

{23} Nevertheless, under these circumstances, we conclude that the error was harmless. *See State v. Sutphin*, 2007-NMSC-045, ¶ 16, 142 N.M. 191, 164 P.3d 72. "[F]undamental error does not occur if the jury was not instructed on an element not at issue in the case." *Id.* Additionally, "when there can be no dispute that the omitted element was established, fundamental error has not occurred and reversal of the conviction is not required." *Id.* At trial, Defendant disputed whether there was a knife because it was not recovered, but he did not argue that the instrument that injured Mr. Gist was not a deadly weapon or was not used in a manner that could cause death or serious injury. Further, considering the evidence that Defendant was angry and punched into the truck's window holding a blade, there can be no dispute that the blade was used in a manner that could (and did) cause serious injury.

{24} All three- or four-inch knives are not deadly weapons as a matter of law, and a jury should be instructed to determine if a particular three- or four-inch blade was used in a manner that could cause death or serious injury. In the present case, however, the jury found that Defendant used a blade to injure Mr. Gist, and given that use of the blade, "it does not 'shock the conscience' or implicate a fundamental

unfairness within the system' to affirm the Defendant's conviction." *Traeger*, 2001-NMSC-022, ¶ 25 (internal quotation marks and citation omitted).

**The Sufficiency of the Evidence for Defendant's Convictions**

{25}    Defendant argues that the evidence did not support his convictions. We review claims for sufficiency of the evidence "in the light most favorable to the State" and "resolve all conflicts and indulge[s] all permissible inferences in favor of the verdict." *Neatherlin*, 2007-NMCA-035, ¶ 8. "We must determine if substantial evidence exists to support a verdict of guilt beyond a reasonable doubt with respect to each element necessary for conviction." *Id.*

{26}    Defendant challenges the sufficiency of the evidence to support his aggravated battery (deadly weapon) conviction, but he does not identify which elements the State failed to prove. "Defendant unreasonably asks this Court to perform a blanket review of [a specific] element of [each] offense . . . and without pointing to evidence on the record, [the d]efendant is essentially asking this Court to re-weigh the evidence against him. Neither role is appropriate for an appellate court on direct appeal." *State v. Gallegos*, 2009-NMSC-017, ¶ 31, 146 N.M. 88, 206 P.3d 993. Defendant further acknowledges that he "attacked Mr. Gist with a knife that Mr. Gist only noticed while it was in his arm" and "removed the knife and drove away." This evidence was sufficient to establish aggravated battery (deadly weapon), and we will not disturb the

15

jury's verdict. *Neatherlin*, 2007-NMCA-035, ¶ 8 ("[W]e do not reweigh the evidence or substitute our judgment for that of the jury.").

{27}     Turning to the conviction for intimidation of a witness, Defendant argues that the State failed to establish that Ms. Dinwiddie felt intimidated, that his words were intended to keep her from reporting the incident, or that Ms. Dinwiddie was "disinclined to report to law enforcement" because she was intimidated. Defendant contends no evidence demonstrated that he physically threatened her or acted in a threatening manner. Because the State presented evidence to establish the elements of intimidating a witness, we affirm the jury's verdict. We explain.

{28}     Defendant was convicted under Section 30-24-3(A)(3), which prohibits

> intimidating or threatening any person or giving or offering to give anything of value to any person with the intent to keep the person from truthfully reporting to a law enforcement officer or any agency of government that is responsible for enforcing criminal laws information relating to the commission or possible commission of a felony offense or a violation of conditions of probation, parole or release pending judicial proceedings.

"A person violates the intimidation statute if he intimidates a person who is likely to be a witness in a judicial proceeding for the purpose of preventing such person from testifying, to abstain from testifying, or to testify falsely." *State v. Martinez*, 2008-NMCA-019, ¶ 5, 143 N.M. 428, 176 P.3d 1160. This Court recently considered the sufficiency of the evidence to support a conviction under Section 30-24-3(A)(3). In

16

*State v. Luna*, 2018-NMCA-025, __ P.3d __, a child witness testified that the defendant told him not to tell anyone about the defendant's actions and that if he told, he would take the child far away and leave him. *Id.* ¶ 35. The child stated that he did not tell anyone initially, until after the defendant was gone. *Id.* We concluded that this evidence was sufficient for the jury to reasonably infer that the defendant intimidated the child "with the intent to keep him from reporting the incident to law enforcement." *Id.* ¶ 38.

**{29}** Defendant's arguments here disregard the extent of Ms. Dinwiddie's testimony. Ms. Dinwiddie first testified that Defendant came to her home angry and threatening, saying that Mr. Gist would "get this" and waving a knife. Next, Ms. Dinwiddie testified that Defendant returned angry because Ms. Dinwiddie had called Mr. Gist to tell him about the first visit. Ms. Dinwiddie then testified that Defendant came back a third time and told Ms. Dinwiddie she should check on her friend at the hospital. As he left a third time—after he told her that Mr. Gist would "get this" while waving a knife around and after returning to tell her that she should go check on Mr. Gist at the hospital—Defendant told Ms. Dinwiddie to "keep it zipped" and "keep it quiet," while making "shushing" gestures and moving his finger across his lips like a zipper. Though she was angry and scared, Ms. Dinwiddie did not call the police. When asked why she did not call the police, Ms. Dinwiddie testified, "do you know what would

17

happen to me if I call the cops on [Defendant]?" Ms. Dinwiddie explained that she was scared to call the police and scared about what Defendant would do or say. The jury reasonably could infer from these facts that Defendant intimidated Ms. Dinwiddie to prevent her from telling law enforcement about what had happened that evening, which is sufficient to demonstrate a violation of Section 30-24-3(A)(3). *See Luna*, 2018-NMCA-025, ¶ 38; *Martinez*, 2008-NMCA-019, ¶ 5.

**Motion for New Trial**

{30}    District courts have "broad discretion in granting or denying a motion for new trial, and such an order will not be reversed absent clear and manifest abuse of that discretion." *State v. Guerra*, 2012-NMSC-027, ¶ 18, 284 P.3d 1076 (internal quotation marks and citation omitted). We reverse a district court's denial of a motion for new trial only if it is "arbitrary, capricious or beyond reason." *State v. Fero*, 1988-NMSC-053, ¶ 12, 107 N.M. 369, 758 P.2d 783. A motion for new trial will only be granted on the basis of newly discovered evidence if the evidence satisfies six criteria:

> (1) It will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it could not have been discovered before the trial by the exercise of due diligence; (4) it must be material; (5) it must not be merely cumulative; and (6) it must not be merely impeaching or contradictory.

*Id.* ¶ 13. When a post-trial motion alleges that a witness perjured herself, "courts must act with great reluctance and with special care and caution before accepting the truth

of a claim of perjury, and should properly require the evidence to affirmatively establish the perjury in such clear and convincing manner as to leave no room for reasonable doubt that perjury was committed." *State v. Betsellie*, 1971-NMSC-076, ¶ 12, 82 N.M. 782, 487 P.2d 484.

{31} Defendant does not dispute that the phone records were discovered after trial or that they could have been discovered before trial. Instead, Defendant contends that the district court incorrectly concluded that the phone records were marginally material and only impeached Ms. Dinwiddie's credibility. Although he acknowledges that the case "did not 'hinge' on phone records," Defendant argues that the phone call testimony established a timeline and there is "no evidence that these phone calls took place." According to Defendant, his cell phone records "affirmatively establish that he did not place a call to Ms. Dinwiddie or receive a call from Mr. Gist during the time in which both witnesses claimed, under oath, that he did." Defendant's arguments demonstrate why the phone-record evidence is relevant to credibility and, at best, contradicts Ms. Dinwiddie's and Mr. Gist's testimony that they made or received calls. In our view, rather than "affirmatively" establishing perjury, the phone-record evidence raises additional questions about the calls made that night. If Defendant could have established that Ms. Dinwiddie lied about the calls, perhaps the jury would have found her to be less credible, but the phone records do not disprove the testimony

19

that Defendant came to her house and threatened her. Similarly, whether Mr. Gist called Defendant before being stabbed does not change the fact that he was actually stabbed by Defendant. Because Defendant did not raise the issue before or at trial, the State did not investigate the witness's phone calls and did not establish what phones were used by whom.

{32} The district court found that the phone-record evidence was marginally material impeachment evidence and that Defendant could have discovered that evidence before trial. This conclusion is not arbitrary, capricious, or beyond reason, and as a result, we find no abuse of discretion.

**Motion to Reconsider Sentencing**

{33} Whether to grant a motion to reconsider a sentencing decision or to hold an evidentiary hearing is also within the district court's discretion. *See* Rule 5-801 NMRA comm. cmt. ("This rule authorizes motions seeking discretionary reduction of a sentence."); *State v. Guerro*, 1999-NMCA-026, ¶ 24, 126 N.M. 699, 974 P.2d 669. Defendant argues that the matter should be remanded in order for the district court to "hear evidence and argument and truly exercise its discretion in ruling on the motion." At the sentencing hearing, Defendant stated that he wanted to proceed to sentencing on that day. Defendant admitted his relevant prior convictions and had an opportunity to address the district court directly. Yet Defendant made no argument in

his motion to reconsider, and makes no argument to this Court, that identifies the basis for reconsideration, nor does he provide any authority to support his request for reconsideration or a hearing. We therefore assume no such authority exists. *In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329. Defendant had the opportunity to delay the sentencing and elected to move forward. Defendant had the opportunity to articulate an argument in support of reconsideration and did not. We decline to remand for a hearing on reconsideration when Defendant has not articulated any basis on which such a motion could be granted.

**CONCLUSION**

{34}    For the foregoing reasons, we affirm Defendant's convictions.

{35}    **IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Chief Judge**

**WE CONCUR:**

_____
**STEPHEN G. FRENCH, Judge**

_____
**EMIL J. KIEHNE, Judge**

21