# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2021-NMCA-036**

**Filing Date: October 1, 2019**

**NO. A-1-CA-37584**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**ZACHARIAH G.,**

Child-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Fred T. Van Soelen, District Judge**

Certiorari Granted, February 3, 2020, No. S-1-SC-37990. Released for Publication October 5, 2021.

Hector H. Balderas, Attorney General
Santa Fe, NM
Jane A. Bernstein, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**VANZI, Judge.**

**{1}** Zachariah G. (Child) appeals his adjudication of delinquency for committing aggravated assault with a deadly weapon upon a school employee, in violation of NMSA 1978, Section 30-3-9(C) (1989), and unlawful carrying of a deadly weapon on school premises, in violation of NMSA 1978, Section 30-7-2.1(A) (1994). We conclude that there is substantial evidence that Child "used" a deadly weapon in his assault. We

also conclude that Child's adjudication does not violate double jeopardy. Accordingly, we affirm.

## BACKGROUND

**{2}** The facts of this case are undisputed. One morning, the principal of Marshall Middle School in Clovis, Todd Morris, learned that Child, a twelve-year-old in the sixth grade, had some sort of a weapon on campus. Morris located Child in the hallway and escorted Child back to his office. As they were walking back to Morris's office, Child kept "fumbling in the front area of his waistband." When they reached his office, Morris had Child empty his pockets in accordance with the limited scope of search school officials were permitted to conduct. Among other items, Child removed a $CO_2$ cartridge from his pockets, which Morris knew was commonly used with BB guns (also referred to as an air pistol). At that point, Morris also noticed a bulge in Child's waistband that "was not consistent with anything that was normal." When asked what he had in his pants, Child refused to reveal the object and told Morris that it was his "dick."[1] Although a security officer was present, Morris was feeling insecure and had his secretary call for police assistance. While they were waiting for the police to arrive, Child asked Morris the following questions: "What would happen if somebody shot up the school?" "Are you afraid to die?" and "How would you feel if a twelve-year-old shot you?" Child's questions made Morris "feel very unsecure." However, Child never told Morris that he had a gun, nor did Child remove the object from his waistband or gesture as if he had a gun. Once the officers arrived, they searched Child and found a BB gun in his pants that resembled an actual firearm.

**{3}** The State filed a delinquency petition charging Child with aggravated assault with a deadly weapon upon a school employee and unlawful carrying of a deadly weapon on school premises. After a jury found that Child committed the crimes charged, the district court adjudicated Child a delinquent child pursuant to NMSA 1978, Section 32A-2-3(B) (2009, amended 2019), and ordered Child to complete a residential treatment program. Additionally, the district court imposed a one-year term of probation. This appeal followed.

## DISCUSSION

**{4}** On appeal, Child raises two arguments. First, Child argues there was insufficient evidence that he "used" a deadly weapon. Second, Child argues that his adjudication of delinquency for aggravated assault with a deadly weapon upon a school employee and unlawful carrying of a deadly weapon on school premises violates double jeopardy. We address both of Child's arguments.

### Mootness

---

[1]Child's brief states that Child told Morris the object was "a stick." However, our careful review of the recording makes clear that Child was not referring to "a stick" but instead, said it was his "dick."

**{5}** As a preliminary matter, we first address the State's argument that Child's appeal is moot. The State argues that we should dismiss Child's appeal because there is no longer an active controversy, as Child's term of probation has ended. Generally, appellate courts will not decide moot cases. *Gunaji v. Macias*, 2001-NMSC-028, ¶ 9, 130 N.M. 734, 31 P.3d 1008. "A case is moot when no actual controversy exists, and the court cannot grant actual relief." *Id.* (internal quotation marks and citations omitted). Notwithstanding this general rule, appellate courts may exercise their discretion to review moot cases that present "issues of substantial public interest or which are capable of repetition yet evade review." *Id.* ¶ 10. In order for an issue to be capable of repetition yet evading review, it must be likely to arise in a future controversy. *Id.* ¶ 11. Under our state mootness doctrine, unlike its more restrictive federal counterpart, the parties' identities are irrelevant. *Id.* Our Court has previously applied this exception to reach issues in children's court cases because such cases often involve short-term commitments. *See, e.g., State v. Jose S.*, 2005-NMCA-094, ¶ 7, 138 N.M. 44, 116 P.3d 115; *State v. Sergio B.*, 2002-NMCA-070, ¶ 11, 132 N.M. 375, 48 P.3d 764.

**{6}** Child argues that this case falls within one of the exceptions to mootness because it presents issues capable of repetition yet evading review. Additionally, Child argues that this case falls within another exception to mootness for cases presenting issues of substantial public interest. We agree with Child. The State argues that Child's case does not fall within this exception because, "rather than rais[ing] general procedural or jurisdiction issues, it involves narrow questions that are specific to [Child's] case and not capable of repetition." In support of its argument, the State cites *State v. Justin C.*, No. A-1-CA-36176, mem. op. ¶ 7 (N.M. Ct. App. Sept. 5, 2018) (non-precedential), in which our Court distinguished that case from *Jose S.* and *Sergio B.*, stating "that [*Justin C.*] does not raise general procedural or jurisdictional issues capable of repetition in the review of other juvenile dispositions." However, *Justin C.* is an unpublished memorandum opinion, which has no precedential value. *See* Rule 12-405(A) NMRA. Moreover, we do not read *Jose S.* and *Sergio B.* as requiring Child to raise only "general procedural or jurisdictional" issues in order to present issues capable of repetition yet evading review. Rather, the holdings of *Jose S.* and *Sergio B.* rest on the short-term nature of dispositions inherent to the Children's Code. *See Jose S.*, 2005-NMCA-094, ¶ 7 ("[*B*]*ecause of the short time frames for Children's Code dispositions* and the sometimes lengthy time for disposition of general calendar cases on appeal, such cases can evade review." (emphasis added)); *Sergio B.*, 2002-NMCA-070, ¶ 11 ("*Many children's court cases will involve short-term commitments of one year or less which could expire before the case was fully briefed before this Court or our Supreme Court*, and thus these issues would evade review unless this exception was invoked." (emphasis added) (citing NMSA 1978, § 32A-2-19(B) (1996, amended 2009))). Indeed, in *Sergio B.*, we stated, "[The c]hild also argues . . . that there was insufficient evidence to support the [district] court's judgment. Th[is] issue[] [is] also capable of repetition." 2002-NMCA-070, ¶ 11. Thus, appeals from the children's court—no matter the specific issues raised—generally fall within the exception for issues that are capable of repetition yet evading review simply because of the nature of children's court sentences. Cases from other contexts illustrate that the deciding factor is the relatively short length of the appellants' sentences, not the specific issues that they

raise on appeal. *See State ex rel. Children, Youth & Families Dep't v. Amanda H.*, 2007-NMCA-029, ¶¶ 17-18, 141 N.M. 299, 154 P.3d 674 (holding that a mother's appeal from an adjudication of neglect or abuse challenging the sufficiency of the evidence fell within the exception for cases capable of repetition yet evading review because "[m]any of these adjudications may involve only short-term deprivations of custody and district court oversight of treatment plans"). Thus, while the issues that Child raises are not "general or procedural," they are capable of repetition and evasive of review.

**{7}** Child also argues that this case presents an issue of substantial public interest because—as we discuss below—our Courts have not addressed what constitutes "use" of a deadly weapon in the course of an assault, which is a question that will most likely recur in the future. *See State v. Jones*, 1998-NMCA-076, ¶ 15, 125 N.M. 556, 964 P.2d 117 ("In determining whether the requisite degree of public interest exists to prevent dismissal on mootness grounds, we consider among other factors . . . the desirability of an authoritative determination for future guidance of public officers, and the likelihood that the question will recur in the future."). We agree. Accordingly, we exercise our discretion to decide Child's appeal despite his term of probation having ended.

**Sufficiency of the Evidence**

**{8}** Child challenges the sufficiency of the evidence supporting the jury's finding that he committed aggravated assault with a deadly weapon on a school employee. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532 (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted). "In reviewing whether there was sufficient evidence to support a conviction, we resolve all disputed facts in favor of the [s]tate, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *Id.* (internal quotation marks and citation omitted). "Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Garcia*, 2009-NMCA-107, ¶ 21, 147 N.M. 150, 217 P.3d 1048 (internal quotation marks and citation omitted). To the extent Child's argument implicates questions of statutory interpretation, our review is de novo. *See State v. Neatherlin*, 2007-NMCA-035, ¶ 8, 141 N.M. 328, 154 P.3d 703.

**{9}** New Mexico defines assault, in relevant part, as "any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery[.]" NMSA 1978, § 30-3-1(B) (1963). The offense is aggravated when it is committed with a deadly weapon. *State v. Branch*, 2018-NMCA-031, ¶ 12, 417 P.3d 1141; *see* NMSA 1978, § 30-3-2(A) (1963). Here, Child was charged with a specific form of aggravated assault on a school employee, which is defined, in pertinent part, as "unlawfully assaulting or striking at a school employee with a deadly weapon while he is in the lawful discharge of his duties[.]" Section 30-3-9(C)(1). Consistent with UJI 14-355 NMRA, the district court instructed the

jury that, in order to find that Child committed aggravated assault with a deadly weapon, it had to find beyond a reasonable doubt that:

1. . . . Child threatened to shoot . . . Morris;

2. . . . Child's conduct caused . . . Morris to believe that . . . Child was about to intrude on . . . Morris's bodily integrity or personal safety by touching or applying force to . . . Morris in a rude, insolent[,] or angry manner;

. . . .

4. A reasonable person in the same circumstances as . . . Morris would have had the same belief; [and]

5. . . . Child used a deadly weapon[.]

**{10}** Child does not challenge the first three elements that the BB gun constituted a deadly weapon but argues that the State did not present sufficient evidence that he "used" the BB gun because he "never brandished or retrieved [the BB gun], motioned toward [the BB gun,] or gestured as though he had [the BB gun]." We disagree.[2]

**{11}** Neither the Criminal Code nor the uniform jury instructions provide a definition for the term "use" within the context of assault with a deadly weapon. Nor does it appear that our courts have had the opportunity to define that term in this context. This Court, however, has defined the term "use" within the context of our firearm enhancement statute penalizing defendants for using a firearm in the commission of a felony. *See* NMSA 1978, § 31-18-16(A) (1993) (providing for an increase to the basic sentence "[w]hen a separate finding of fact by the court or jury shows that a firearm was used in the commission of a noncapital felony"). In *State v. Trujillo*, 1978-NMCA-041, ¶¶ 1, 10, 91 N.M. 641, 578 P.2d 342, the defendant was convicted of several counts of aggravated assault and battery and received an enhanced sentence for each count for using a firearm in the commission of the underlying felonies. On appeal, the defendant challenged the sentence enhancement for one of the batteries in which he clubbed a victim with the firearm. *Id.* ¶ 11. The defendant claimed, "[T]he Legislature intended to increase the sentence only when a firearm is 'used' in accordance with its intended purpose, the shooting of a projectile or placing persons in fear of the shooting of a projectile, in order to accomplish a crime." *Id.* (internal quotation marks omitted). In rejecting this argument, we cited with approval the following passage from *People v. Chambers*, 498 P.2d 1024, 1027-28:

By employing the term 'uses' instead of 'while armed' the [l]egislature requires something more than merely being armed. One who is armed

---

2We note that, although Section 30-3-9 does not contain the term "use," the jury instructions, based on UJI 14-355, became the law of the case against which we measure the sufficiency of the evidence. *See Garcia*, 2009-NMCA-107, ¶ 21.

with a concealed weapon may have the potential to harm or threaten harm to the victim and those who might attempt to interrupt the commission of the crime or effect an arrest. Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies. 'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed.

(Citations omitted.)

**{12}** We similarly concluded that "[t]he obvious intent of the New Mexico Legislature [in enacting the firearm enhancement statute] was to deter the use of firearms in committing felonies; consistent with that intent, 'use' should be broadly construed." *Trujillo*, 1978-NMCA-041, ¶ 14. Consequently, we held that the defendant's use of the firearm fell within the meaning of the firearm enhancement statute. *Id.*

**{13}** One year later, in *State v. Chouinard*, 1979-NMCA-145, ¶ 5, 93 N.M. 634, 603 P.2d 744, we again addressed the meaning of "use" within the context of the firearm enhancement statute and held that the defendant must do more than simply possess a firearm. In that case, the defendant and a codefendant were arrested after selling cocaine to an undercover agent. *Id.* ¶ 3. The state charged the defendant with, inter alia, using a firearm in the trafficking of cocaine because he and his codefendant had pistols in their belts and vehicle. *Id.* The district court dismissed the firearm enhancement count because "[n]either defendant ever drew or pointed his gun at the police officers at any time." *Id.* The state appealed the dismissal of the firearm enhancement count. *Id.* ¶ 1. This Court acknowledged that we construed the term "use" broadly in *Trujillo* to include the use of a gun as a club but we declined to "stretch the meaning of 'use' to include 'non-use.' " *Chouinard*, 1979-NMCA-145, ¶ 5. We concluded that "[t]he use of a firearm is something beyond mere possession of it." *Id.* ¶ 5. As a result, we held that the defendant did not "use" the firearm because "the [s]tate d[id] not contend that either defendant ever showed his gun or threatened to use it during the alleged sale of cocaine[.]" *Id.* ¶ 8.

**{14}** Neither of these cases defined the term "use" within the context of assault with a deadly weapon; however, we find their analyses instructive. Similar to the firearm enhancement statute discussed in *Trujillo* and *Chouinard*, the purpose of the aggravated assault statutes is to deter the use of deadly weapons. *See State v. Rodriguez*, 1992-NMCA-035, ¶ 17, 113 N.M. 767, 833 P.2d 244 ("The aggravated assault statute is aimed at deterring aggression against other people in which the use of deadly weapons is involved."). Although we construe the term "use" broadly to effect that purpose, *cf. Trujillo*, 1978-NMCA-041, ¶ 14, we do not construe the term so broadly as to encompass non-use or mere possession of a deadly weapon, *see Chouinard*,

1979-NMCA-145, ¶ 5. " 'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' " *Trujillo*, 1978-NMCA-041, ¶ 12 (quoting *Chambers*, 498 P.2d at 1027-28); *see also Use, Black's Law Dictionary* 1776 (10th ed. 2014) (defining "use," in relevant part, as "[t]o employ for the accomplishment of a purpose; to avail oneself of"). While we recognize this is a close case, we conclude that Child's "use" of the BB gun falls within this definition.

**{15}**     Contrary to Child's assertions, this is not a situation where Child merely possessed the BB gun. While Child did not pull out, motion toward, or tell Morris that he had the gun, it was nonetheless instrumental and applied to Child's advantage in his threatening of Morris. The jury could reasonably infer that Child knew Morris was aware that Child had some sort of weapon when Morris escorted him to his office, asked him to empty out his pockets, and inquired about the bulge in his pants. Additionally, the jury could infer that Child knew Morris had reason to believe that Child had some sort of gun because Child removed a $CO_2$ cartridge from his pockets, which Morris testified was commonly used with BB guns and because Child refused Morris's request that he remove the object. Capitalizing on Morris's awareness of the bulging object, later revealed to be a BB gun, Child asked Morris menacing questions while they waited for the police, including: "What would happen if somebody shot up the school?" "Are you afraid to die?" and "How would you feel if a twelve-year-old shot you?" Unlike the defendant in *Chouinard*, who did not threaten to use his firearm, 1979-NMCA-145, ¶ 8, Child essentially threatened Morris with the gun through these pointed questions. Indeed, when the prosecutor asked Morris if he had to see the weapon to be apprehensive about Child using it, Morris testified, "No ma'am, not after those statements. He kept building on those statements. The statements that he kept making . . . led me to that[.]" A reasonable juror could have determined that the BB gun was instrumental to Child's assault because, without the BB gun bulging from Child's pants—which Child knew Morris was aware of—Child's menacing questions would not have carried the same threat of imminent harm to Morris. In other words, Child "used" the BB gun to transform his questions from possibly hypothetical to real threats, thereby instilling greater fear in his victim. We conclude that substantial evidence supported the jury's finding that Child "used" the BB gun.

**{16}**     Child argues that our case law "seems to suggest that 'use' of a deadly weapon in the context of threatening or menacing conduct means, at the very least, displaying the weapon in a rude, insolent[,] or angry manner." But none of the cases Child cites addressed the question of what constitutes "use" of a deadly weapon because the parties did not dispute the issue in light of the unquestionable ways the defendants used the weapons. *See State v. Herrera*, 2015-NMCA-116, ¶ 16, 362 P.3d 167 (affirming conviction where the defendant held a knife to the victim's throat and told the victim that he was going to kill him); *State v. Wiseley*, No. 32,088, mem. op. ¶ 30 (N.M. Ct. App. Feb. 10, 2014) (non-precedential) (affirming conviction where the defendant waved around a large piece of glass and threatened the victims with it); *State v. Bachicha*, 1991-NMCA-014, ¶¶ 2-3, 13, 15, 111 N.M. 601, 808 P.2d 51 (affirming conviction where the defendant pointed a rifle at several victims, threatened the victims with the rifle, and

shot one victim). While we agree that most cases of aggravated assault with a deadly weapon will involve deadly weapons being used in a more obvious way, as this case demonstrates, an individual can use a deadly weapon in other, more insidious, ways. *Cf. Smith v. United States*, 508 U.S. 223, 230 (1993) ("That one example of 'use' is the first to come to mind when the phrase 'uses . . . a firearm' is uttered does not preclude us from recognizing that there are other 'uses' that qualify as well." (omission in original)).

**Double Jeopardy**

**{17}** Child next claims that his adjudication of delinquency for both aggravated assault with a deadly weapon on a school employee and unlawful carrying of deadly weapon on school premises violates his right to be free from double jeopardy. *See* U.S. Const. amend. V; N.M. Const. art. II, § 15; *State v. Doe*, 1977-NMCA-120, ¶¶ 1, 3, 91 N.M. 158, 571 P.2d 425 (applying double jeopardy to children's court's adjudication of delinquency). We disagree.

**{18}** Double jeopardy protects against multiple punishments for the same offense. *Swafford v. State*, 1991-NMSC-043, ¶ 6, 112 N.M. 3, 810 P.2d 1223. Whether separate convictions violate double jeopardy is a question of law, which we review de novo. *See State v. Montoya*, 2013-NMSC-020, ¶ 22, 306 P.3d 426. For double description cases, like the present one, we apply the two-part test set forth in *Swafford*, 1991-NMSC-043, ¶ 25. First, we determine whether the conduct underlying the offenses is unitary. *Id.* Conduct is not unitary if "sufficient indicia of distinctness" separate the illegal acts. *Id.* ¶ 26.

> [I]ndicia of distinctness include the separation between the illegal acts by either time or physical distance, the quality and nature of the individual acts, and the objectives and results of each act. Distinctness may also be established by the existence of an intervening event, the defendant's intent as evinced by his or her conduct and utterances, the number of victims, and the behavior of the defendant between acts.

*State v. Barrera*, 2001-NMSC-014, ¶ 36, 130 N.M. 227, 22 P.3d 1177 (internal quotation marks and citation omitted). Ultimately, we must decide "whether the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." *State v. Quick*, 2009-NMSC-015, ¶ 8, 146 N.M. 80, 206 P.3d 985 (emphasis, internal quotation marks, and citation omitted). If the conduct is unitary, we then "focus[] on the statutes at issue to determine whether the [L]egislature intended to create separately punishable offenses." *Swafford*, 1991-NMSC-043, ¶ 25. Double jeopardy prohibits multiple punishments in the double-description context only where the conduct is "unitary" and where the Legislature did not intend to create separately punishable offenses. *Id.* ¶¶ 9, 25.

**{19}** In regard to the first prong, Child argues that he "committed a singular culpable act—he brought [a BB gun] to school and threatened the principal with it." Child's own

argument belies his double jeopardy claim, as he admits that he: (1) brought the BB gun to school *and* (2) threatened Morris with it. The facts presented at trial demonstrate that Child's actions were not unitary. Morris testified that he first learned that Child had some sort of weapon on campus at approximately 8:15 a.m. and located Child shortly thereafter in the hallway. At the point that Child crossed onto the school grounds with the BB gun, Child completed the crime of unlawfully carrying a deadly weapon on school premises. *See* § 30-7-2.1(A) ("Unlawful carrying of a deadly weapon on school premises consists of carrying a deadly weapon on school premises."); § 30-7-2.1(B)(1) (defining "school premises" as "the buildings and grounds . . . of any public elementary, secondary, junior high or high school"). Child did not assault Morris until after Morris escorted Child back to his office, asked Child to empty his pockets, and called the police. Thus, both time and location separated Child's acts of bringing the BB gun to school and threatening Morris with it, and, the two acts were not unitary. *See State v. Contreras*, 2007-NMCA-045, ¶ 21, 141 N.M. 434, 156 P.3d 725 ("[W]e will not find that a defendant's conduct is unitary where the defendant completes one of the charged crimes before committing the other."). In addition, the criminal acts were of distinct quality and nature, affected different victims, and were motivated by different objectives. By carrying the BB gun on campus, Child's actions jeopardized the safety of everyone at the school. Indeed, Child revealed to the police officers after his arrest that he was planning to "shoot at large crowds of students or staff while at school and after any of them would fall down, he would go to them at that point, after they were shot with the BB gun, [and] if they fell down he was gonna go over there and snap their necks."

**{20}** Child argues that "[t]here is nothing in the record to suggest that the State attempted to distinguish bringing the weapon to school and using it in a threatening manner." As noted earlier, however, the proper inquiry is "whether the facts presented at trial establish that the jury *reasonably could have inferred* independent factual bases for the charged offenses." *Quick*, 2009-NMSC-015, ¶ 8 (emphasis added) (internal quotation marks and citation omitted). Given the facts here, we conclude that the jury reasonably could have inferred independent factual bases for the charges of aggravated assault with a deadly weapon on a school employee and unlawful carrying of deadly weapon on school premises. Accordingly, Child's adjudication of delinquency premised on the two charges does not violate his right to be free from double jeopardy. *See Swafford*, 1991-NMSC-043, ¶ 25.

**CONCLUSION**

**{21}** For the foregoing reasons, we affirm Child's adjudication of delinquency.

**{22}   IT IS SO ORDERED.**

**LINDA M. VANZI, Judge**

**VARGAS, Judge (specially concurring).**

**{23}** While I concur in the majority opinion, I write separately to agree with the Dissent that New Mexico law would benefit from a more precise definition of the term "use" when considering whether a defendant "used" a deadly weapon in the commission of a crime. Our long-standing, but never-discussed standard set out in *Trujillo*, 1978-NMCA-041, ¶¶ 12-14, and further explained in *Chouinard*, 1979-NMCA-145, ¶¶ 5-6, 8, defining "use" in the context of a firearm provides limited guidance. This is especially true in those instances when the item identified as the deadly weapon is not a firearm, but an item that is generally not considered to be a weapon. *See* Dissent Op. ¶ 27 (listing examples of items generally not considered to be weapons). In my view, the standard identified by the dissent in *People v. Granado*, 49 Cal. App. 4th 317 (Cal. Ct. App. 1996) and adopted by the California Supreme Court in *People v. Wilson*, 187 P.3d 1041, 1072 (Cal. 2008), *see* Dissent Op. ¶ 30, would be a helpful addition to our case law defining "use" in circumstances when the state charges that a deadly weapon was employed in the commission of a crime.

**JULIE J. VARGAS, Judge**

**IVES, Judge (dissenting in part and concurring in part).**

**{24}** The significance of this appeal might not be immediately apparent. It is of obvious significance to Child, who argues that his offense was a misdemeanor, assault on a school employee, *see* § 30-3-9(B)(2), rather than a felony, aggravated assault on a school employee with a deadly weapon, *see* § 30-3-9(C)(1). But Child's appeal also has significance statewide for those accused of a variety of assault offenses, as well as the victims of those offenses. In such cases, the definition of "use" will impact whether New Mexicans are convicted of misdemeanors or felonies. *Compare, e.g.,* § 30-3-1 (assault, a petty misdemeanor), *with* § 30-3-2(A) (aggravated assault with a deadly weapon, a felony). This distinction between misdemeanor and felony convictions impacts the potential term of incarceration. *See* NMSA 1978, § 31-19-1 (1984) (stating that the maximum incarceration is six months for petty misdemeanor and 364 days for misdemeanor); NMSA 1978, § 31-18-15(A)(13) (2019) (setting eighteen-month basic sentence for fourth-degree felonies, including aggravated assault with a deadly weapon); NMSA 1978, § 31-18-15.1(G) (2009) (allowing increase in felony sentence of up to one-third of the basic sentence). Felony convictions also carry serious collateral consequences. *See, e.g.*, N.M. Const. art. VII, § 1(A) (providing that people convicted of a felony are not qualified to vote if restricted by statute); NMSA 1978, § 30-7-16(A)(1), (B) (2019) (defining criminal offense of possession of a firearm by a felon).

**{25}** With these high stakes in mind, I write to explain why I think New Mexico should adopt a more precise definition of "use" and to offer such a definition. Applying that definition, I respectfully disagree with my esteemed colleagues' conclusion that the evidence would allow a rational jury to find beyond a reasonable doubt that Child "used" the BB gun. Child never aimed, brandished, revealed, gestured toward, or even mentioned the BB gun, which he kept concealed in his clothing throughout the encounter with Morris. Child used words—not the BB gun—to commit the assault. This

was a delinquent act: misdemeanor assault on a school employee. But it was not felony aggravated assault on a school employee.

## I.     The Meaning of "Use"

**{26}**    Clearly and precisely defining "use" is, in my view, necessary to decide Child's case and future cases. As the entire panel recognizes, what constitutes "use" is a question of substantial public interest because it is likely to arise repeatedly. Indeed, whether a person has "used" a deadly weapon is a question at the heart of many cases, including those in which people are accused of aggravated assault.[3]

**{27}**    Defining "use" appropriately is especially important for cases in which people are accused of committing aggravated assaults with deadly weapons based on their "use" of ordinary items, rather than firearms or other items commonly used as weapons. Our Legislature has defined "deadly weapon" to encompass "any weapon which is capable of producing death or great bodily harm" and "weapons with which dangerous wounds can be inflicted[.]" NMSA 1978, § 30-1-12(B) (1963). Many ordinary items—such as trivets, screwdrivers, and pocketknives—may qualify as deadly weapons. *See State v. Nick R.*, 2009-NMSC-050, ¶¶ 40, 49, 147 N.M. 182, 218 P.3d 868. Cases involving such items, which are not ordinarily used as weapons, can raise an especially difficult question. A few hypotheticals illustrate the difficulty. Imagine an accused who threatens to harm a victim while holding a trivet during service of a meal; while opening a toolbox with a screwdriver inside; or shortly after a pocketknife falls from the accused's pocket. Did the accused merely possess the item at the time of the assault, or did the accused actually "use" the item to facilitate the assault? Similar situations come to mind in the school setting. A child might utter threatening words to a school employee or fellow student while the child holds or has easy access to a pencil, a drawing compass, a metal water bottle, or a baseball bat. Such items could be deemed deadly weapons, even though children in schools across our state possess and use them for legitimate reasons every day. It would be far more difficult to determine whether a child who threatened another child in a classroom while holding a pencil "used" the pencil in the assault than it would be to determine whether a child who threatened a classmate while brandishing a firearm "used" the firearm. To correctly distinguish between felony and misdemeanor assaults, New Mexico law should draw the line between use and non-use as clearly and carefully as possible.

**{28}**    But our Legislature has not defined "use," and our Supreme Court has not had occasion to discuss its meaning. Nor does New Mexico have a uniform jury instruction defining the verb. The only New Mexico authorities on the topic are this Court's 1978 opinion in *Trujillo* and 1979 opinion in *Chouinard*, both of which relied on the Supreme

---

3Charges in such cases include aggravated assault with a deadly weapon, § 30-3-2(A); UJI 14-304 NMRA; UJI 14-305 NMRA, aggravated assault on a household member with a deadly weapon, NMSA 1978, § 30-3-13(A)(1) (1995); UJI 14-374 NMRA; UJI 14-375 NMRA; UJI 14-376 NMRA, aggravated assault on a peace officer with a deadly weapon, NMSA 1978, § 30-22-22(A)(1) (1971); UJI 14-2201 NMRA; UJI 14-2202 NMRA; UJI 14-2203 NMRA, and aggravated assault on a school employee, § 30-3-9(C)(1), a sports official, NMSA 1978, § 30-3-9.1(D) (2001), or health care personnel, NMSA 1978, § 30-3-9.2(C)(1) (2006), with a deadly weapon, UJI 14-354 NMRA; UJI 14-355 NMRA; UJI 14-356 NMRA.

Court of California's 1972 opinion in *Chambers*. The majority opinion accurately distills the following concepts from *Chambers*, *Trujillo*, *Chouinard*: (1) we apply a number of dictionary definitions of "use"; (2) we construe the verb broadly; (3) mere possession of a weapon during the commission of an offense is not use; (4) use is more than a bare potential for use; (5) conduct need not produce physical harm to constitute use; and (6) use can be conduct that produces fear of harm or force by means or display of a firearm. I do not believe these concepts define "use" with sufficient precision.

{29}    Because our precedents are four decades old and rely on an out-of-state case that is nearly half a century old, it seems reasonable to ask whether courts in California or elsewhere have developed more helpful ways of defining what it means to "use" a weapon in the commission of an offense. To that end, a majority of the panel requested supplemental briefs on the important question of first impression Child's appeal presents. Those briefs confirm that the law has evolved.

{30}    Developments in California are of particular interest because we have already adopted its jurisprudence and because California courts have since refined the definition of "use" that we relied on in *Trujillo* and *Chouinard*. Child cites *Granado*, 49 Cal. App. 4th 317, in which the defendant challenged his sentencing enhancement for using a firearm. Affirming, the court discussed the meaning of "use" of a firearm, beginning with the Supreme Court of California's decision in *Chambers* and then describing subsequent developments. The court explained that use requires broad construction "to check the magnified risk of serious injury which accompanies any deployment of a gun in a criminal endeavor." *Id.* at 322. However, the court recognized that "a finding of weapon use is precluded if the defendant's *conduct* with respect to the weapon appears to be purely incidental to the crime." *Id.* at 324. The court noted that, in a prior case, it had held that evidence of firearm use "was insufficient because, even though the gun was exposed to the victim's view, the exposure was not an act in furtherance of the crime, but a mere incident of possession." *Id.* The court explained that "[t]he litmus test" for the distinction between using a gun in the commission of a felony and being armed during the offense is whether the defendant "too[k] some *action* with the gun *in furtherance of the commission* of the crime[.]" *Id.* at 324 n.7. If so, the gun was used. *Id.* But if "the defendant engaged in no weapons-related conduct, or such conduct was incidental and unrelated to the offense, no 'use' occurred[.]" *Id.* The court observed that the Supreme Court of California had stated, in yet another case, that displaying a firearm without actually using it to facilitate the commission of an offense does not constitute use of the firearm. *Id.* at 324-25. In the *Granado* court's view, that statement "confirm[ed] the commonsense requirement of a facilitative, gun-related act before the defendant can be found to have 'used' the gun." *Id.* at 325 (emphasis omitted). The court concluded that "the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure" if "a defendant deliberately shows a gun, or otherwise makes its presence known[.]"[4] *Id.* The Supreme Court of California

---

[4]California law includes an additional principle that is generally helpful but does not impact Child's appeal. The jury may find facilitative use if "there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense[.]" *Id.; accord Wilson*, 187 P.3d at 1072.

has adopted this conclusion as a statement of California law. *See Wilson*, 187 P.3d 1041, 1072.

**{31}** I agree with California's approach. Adding the principles described above to New Mexico jurisprudence would assist this Court in correctly analyzing Child's appeal, and it would benefit our appellate and trial courts, the bar, and the public.

## II. The Evidence That Child Used the BB Gun Was Insufficient

**{32}** The State's evidence would not allow a rational jury—relying on an appropriate definition of "use"—to find beyond a reasonable doubt that Child used the BB gun to assault Morris. I would therefore hold that the evidence is insufficient to support Child's conviction for *aggravated* assault on a school employee.

**{33}** When reviewing the sufficiency of the evidence, our duty is to "supervis[e] . . . the jury's fact-finding function to ensure that, indeed, a rational jury could have found beyond a reasonable doubt the essential facts required for a conviction." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (emphasis, internal quotation marks, and citation omitted). We must neither speculate nor "sanction a view that assumes the worst about human nature" because doing so would conflict with "an essential message of the presumption of innocence." *State v. Mariano R.*, 1997-NMCA-018, ¶ 7, 123 N.M. 121, 934 P.2d 315. To affirm, we must be satisfied that the jury "ha[d] a sufficient evidentiary basis to conclude that the defendant actually committed the criminal act he is accused of, not just that he may have done it among a range of possibilities or that it cannot be 'ruled out' among other possible explanations, or even that it is more likely than not." *State v. Consaul*, 2014-NMSC-030, ¶ 70, 332 P.3d 850. Our standard of review is highly deferential in some respects, but we owe no deference on questions of law, which we review de novo. *Consol. Elec. Distrib., Inc. v. Santa Fe Hotel Grp., LLC*, 2006-NMCA-005, ¶ 7, 138 N.M. 781, 126 P.3d 1145.

**{34}** A question of law—the meaning of "use" in the uniform instruction the jury received—should drive the analysis in Child's appeal. The evidence does not prove beyond a reasonable doubt that Child "deliberately show[ed]" the BB gun to Morris "or otherwise ma[de] its presence known" to him. *See Wilson*, 187 P.3d at 1072 (internal quotation marks and citation omitted). The State did not present any evidence that Child aimed, brandished, revealed, gestured toward, or mentioned the BB gun. In fact, the evidence showed that Child did the opposite of showing the BB gun to Morris or otherwise making its presence known to him. Child acted to *prevent* Morris from seeing the BB gun or otherwise knowing about its presence. Child kept the BB gun concealed in his pants. When Morris asked what was in Child's pants, Child did not say he had a BB gun. Child's hypothetical questions were menacing, but he never referred to the BB gun in any way, either verbally or physically, when he asked those questions or at any other point during the encounter. Because Child "did [not] take some action with the [BB] gun in furtherance of the commission of the [assault,]" *Granado*, 49 Cal. App. 4th at 324 n.7 (emphasis omitted), he did not "use" the BB gun.

**{35}**    I respect but do not share the majority's perspective on this close case. Child's questions did not constitute use of the BB gun because Child did not refer to it, and the majority has not identified any other BB-gun-related act that could rationally support a finding of "use" beyond a reasonable doubt. The majority relies heavily on "the gun bulging from Child's pants," Majority Op. ¶ 15, but Child took no action to indicate that the item in his pants was a BB gun, a firearm, or any other deadly weapon. So the bulge is no more than "a mere incident of [his] possession." *Granado*, 49 Cal. App. 4th at 324. The majority also relies on the $CO_2$ cartridge, Majority Op. ¶ 15, but Child did nothing with respect to the cartridge that supports a reasonable inference that he used the BB gun. Child removed the cartridge from his pockets involuntarily, on Morris's orders, and Child never referred to the $CO_2$ cartridge during the encounter. Finally, the majority cites Morris's trial testimony that he was apprehensive, *see id.*, but whether Child caused Morris to be apprehensive and whether Child *used the BB gun* to cause that apprehension are distinct inquiries. As the jury instruction confirms, the State bore the burden of proving two separate essential elements: that Child "caused [Morris] to believe" Child was going to harm him *and* that Child "used" the BB gun. Conflating the two relieves the State of its burden of proving the element of use beyond a reasonable doubt. Proving what Child caused Morris to believe is no substitute for proving that Child used the BB gun.

**{36}**    Nothing Child said or did indicated that whatever was in his pants would be the means of carrying out his threats. And his threats would have caused Morris "to believe [that Child] was about to intrude on [his] bodily integrity or personal safety," regardless of whether Child had a BB gun or something else in his pants. I conclude that a rational jury could not find that the evidence proved beyond a reasonable doubt that Child performed "a facilitative, gun-related act." *Granado*, 49 Cal. App. 4th at 325. Child assaulted Morris using words, not the BB gun.

**{37}**    By reaching this conclusion, I do not intimate that the jurors in Child's case were irrational. I find no fault in their work because, in my view, they lacked the tools necessary for the job. The jury instructions required them to decide whether the State proved beyond a reasonable doubt that Child "used" the BB gun, but the jurors never received any instruction defining "use."[5] It might seem counterintuitive to define a common, non-technical word such as "use" for juries. However, the meaning of "use" is "elastic" and, as with many common words, "inordinately sensitive to context." *Smith*, 508 U.S. at 241, 245 (Scalia, J., dissenting, joined by Stevens J. and Souter, J.). As Child's case and others illustrate, jurists and lawyers—whose job is to understand what words mean and use them appropriately—have vigorously debated the meaning of "use" in various contexts. *See, e.g*, *id.* at 225, 241 (dividing the Supreme Court of the United States six to three on the definition of "use" of a firearm "during and in relation to . . . [a] drug trafficking crime"). These struggles strongly suggest that a uniform

---

[5]The structure of the UJI at issue, UJI 14-305, exacerbates the problem. The UJI requires the jury to find (1) that "[t]he defendant's conduct caused [the victim] to believe the defendant was about to intrude on [the victim's] bodily integrity or personal safety"; and (2) that "[t]he defendant used a . . . deadly weapon." *Id*. It does not explicitly state what the defendant must have used the deadly weapon at issue *for* in order to have committed an aggravated assault.

instruction defining "use" would help juries more effectively perform their critical function of returning accurate verdicts.[6] Such an instruction would also improve the quality and efficiency of appellate review, which entails measuring the sufficiency of the evidence against the instructions the jury received. *See Garcia*, 2009-NMCA-107, ¶ 21. Without a definitional instruction, appellate judges must divine an appropriate definition. And the definition—or, worse, as in this case, multiple definitions—on which appellate judges rely will not necessarily be the same as the definition—or, again worse, definitions—on which jurors relied during deliberations. Adopting one context-specific definition of this elastic word strikes me as an idea worth exploring.[7]

## Conclusion

**{38}** I respectfully dissent from the majority's conclusion that a rational jury could have found beyond a reasonable doubt that Child "used" the BB gun. I would therefore reverse Child's adjudication of delinquency for aggravated assault on a school employee and remand for an adjudication of assault on a school employee, a lesser-included offense on which the jury was instructed. *See State v. Villa*, 2004-NMSC-031, ¶ 11, 136 N.M. 367, 98 P.3d 1017 (holding that an appellate court that has vacated a conviction for insufficient evidence may remand for entry of judgment on a lesser-included offense only if the jury was instructed on the lesser-included offense).

**{39}** I join the sections of the Court's opinion declining to dismiss Child's appeal as moot and finding no double jeopardy violation.

**ZACHARY A. IVES, Judge**

---

6Defining words with common meanings in a uniform instruction is not unprecedented in New Mexico. Our Supreme Court has approved a uniform instruction defining "possession." UJI 14-130 NMRA. Like the word "possession," the word "use" is central to determinations of criminal liability in a wide variety of common cases, as I have described. New Mexico would not be alone in defining "use" for juries. *See, e.g.*, Tenth Circuit Pattern Instruction 2.45 (2018) (defining "use" for purposes of 18 U.S.C. § 924(c)(1)(A) (2018), which prohibits knowingly using a firearm during and in relation to a drug trafficking crime or crime of violence). By citing this instruction as an example, I do not imply that its content, which is tailored to a particular federal offense, would fit New Mexico's aggravated assault offenses.

7Our appellate courts have often rejected arguments that district courts erred by failing to give instructions defining terms with common meanings. *See, e.g., State v. Munoz*, 2006-NMSC-005, ¶¶ 23-26, 139 N.M.106, 129 P.3d 142 (holding that the court did not err in refusing a definitional instruction on "protracted period of time"). But, in my view, whether such an argument regarding the definition of "use" would have any merit in an imagined appeal is not the appropriate question when considering adoption of a uniform instruction defining "use." I would ask instead whether experience teaches that adopting a uniform instruction would make our system function more justly. *See* UJI 14-130 NMRA comm. cmt. ("The committee recognizes that experience under the UJI Criminal may indicate that additional definitions should be included[.]").